MADISON SQUARE GARDEN
BOXING, INC., Plaintiff,

v.

Earnie SHAVERS, Defendant.

No. 77 Civ. 2940.

United States District Court,
S. D. New York.

June 28, 1977.

Simpson, Thacher & Bartlett, New York City by John A. Guzzetta, Barry R. Ostrager, and Dennis G. Jacobs, New York City, of counsel, for plaintiff.

Charles A. Stillman, New York City, for defendant.

MEMORANDUM AND ORDER

OWEN, District Judge.

Before me is a motion by plaintiff Madison Square Garden Boxing, Inc. (the Garden) for a preliminary injunction enjoining defendant Earnie Shavers, heavyweight championship contender, from participating in any boxing match until he fulfills his contractual obligations to plaintiff.

On June 23, 1977, I held a hearing at which Teddy Brenner of the Garden, Earnie Shavers, and Frank Luca, Shavers' business

manager, testified. Also before me were various documents and affidavits. Because of time pressure, I notified the parties on Friday, June 24th, that the preliminary injunction was granted. In conformity with Rule 52(a), I now state my findings of fact and conclusions of law.

The Garden has an option contract with Muhammed Ali for a heavyweight championship bout to take place between September 1 and October 10, 1977. This option will expire on July 1, 1977 unless the Garden exercises the option by June 30, 1977.

The Garden, through Teddy Brenner, its matchmaker, entered into negotiations with Frank Luca, Shavers' business manager, for this championship fight. By about May 16, the parties were in essential agreement. In a telephone conversation between Brenner and Luca, Brenner asked Luca to send him a telegram accepting the Garden's offer. A telegram, set out in the margin,[1] signed by Shavers, Luca and Joseph Gennaro, Shavers' manager, "accepted" the Garden's "offer."

Upon receipt of and in reliance upon this telegram, the Garden reached a multi-million dollar agreement with the National Broadcasting Company to televise the fight.

The next day Brenner prepared a "letter agreement" to "document the substance of an understanding between us." This letter agreement differed from the telegram in certain particulars:

(a) The date for the exercise of the option was extended from June 15 to July 1, 1977;

(b) The purse was set as a "total amount of $200,000" instead of "a minimum guarantee of $200,000;"

(c) There was an express non-competition clause.

On or about May 23, 1977, Brenner telephoned Luca to check that everything was in order and ask if the letter agreement had been signed. The parties worked out certain discrepancies during this conversation:

(a) The option date was extended to July 1, 1977 to coordinate with the Ali option;

(b) Shavers' compensation beyond the $200,000 was to include both closed-circuit television rights in Ohio if the bout was telecast on closed-circuit, and Shavers' training expenses at Grossingers which would normally be paid by Luca and Gennaro,[2] as well as some other minor extras such as tickets and fare, about which I did not take testimony;

■ (c) There was no discussion of the non-competition clause. I find that, given the eight week training period necessary to prepare for a title bout[3] and the practice in the industry, this term would have been implied, if it had not been expressly stated.[4]

At this point in their conversation, I find that the contract in its final form was agreed upon. The parties "had a deal," even though the letter agreement was never signed by Shavers, Luca and Gennaro.

Luca *then* asked to "borrow" $30,000 (get an advance on the purse of $30,000). Brenner said he could guarantee him $20,000 but would have to discuss the remaining $10,000 with Michael Burke, president of Madison

---

1. ERNIE SHAVERS WILL BOX MUHAMMED ALI FOR THE HEAVYWEIGHT CHAMPIONSHIP OF THE WORLD IN MADISON SQUARE GARDEN ON OR BEFORE OCTOBER 10 1977. SHAVERS IS TO RECEIVE A MINIMUM GUARANTEE OF $200,000.00 IF BOUT IS NOT SIGNED FOR BY JUNE 15 1977 $10,000.00 WILL BE FORFEITED TO SHAVERS. SHAVERS WILL GRANT MADISON SQUARE GARDEN BOXING OPTION OF FIRST REFUSAL ON FIRST AND SECOND TITLE DEFENSES AT TERMS MUTUALLY AGREEABLE. THANK YOU

2. Luca testified that he did not want the expenses as part of the contract, because that

money would be paid directly to him. Trans. at 69.

3. Trans. at 78. Also, if Shavers lost a bout prior to the Ali fight, the value to the Garden of the option contract would be diminished considerably.

4. The telegram also included the right of first refusal to the Garden of a subsequent fight if Shavers was victorious. It appears that there was no discussion of the omission of this term —which, in any case, would inure only to the Garden's benefit. Preliminarily, I find this term not a part of the contract.

Square Garden, and would get back to him. There was a delay of one and one-half days in this since Brenner's attentions were directed elsewhere, and by the time Brenner was able to reach Luca, Luca told him that he had an offer from Robert Arum, president of Top Rank, Inc. for $300,000 for an Ali-Shavers fight during the same time period. The Top Rank contract, which was signed on May 26, stated that if Top Rank could not get the Ali fight, it promised to get one of several other fighters for the same $300,000 purse to Shavers. Shavers has received a $30,000 advance on this contract.

Both Luca and Shavers testified before me that they did not consider that they had a deal until they *had* the $30,000 advance. I do not credit their testimony. The advance was not mentioned in the telegram. Luca also testified that he specifically told Brenner that not only was there no deal until they received the advance, but also that until that time they would continue to negotiate with Top Rank.[5] Brenner denies being told this and I credit him. I observed both men on the witness stand. It is inconceivable that Brenner—knowledgeable, energetic and vocal—having an option agreement with Ali which would expire on July 1 and a multi-million dollar contract in hand for television rights to the fight with NBC, would not have pinned down this alleged last item of the deal if Luca had told him what he *says* he told him. I reject Luca's version of this conversation.

While I have not *heard* the testimony of Robert Arum,[6] from the affidavit of Commissioner Floyd Patterson[7] of the New York State Athletic Commission, sworn to on June 20, 1977 and which I credit, I find it is more likely so than not so that Luca was misled into believing that Arum had the Garden's "blessings" in negotiating the subsequent contract. Besides the conversation when Commissioner Patterson was on the line, Luca also stated to Brenner on other occasions that Arum had told him that Top Rank and the Garden were partners.

It is also significant that Luca, after speaking with his lawyer, DiBlasio, told Brenner, in the presence of both Brenner's lawyer and his own, that he "had been told by Mr. DiBlasio that if you had to be sued by either one, he would prefer that it were

5. Luca, to lend support to his testimony, points to some notes which he allegedly contemporaneously made with a blue ballpoint pen at the bottom of Brenner's covering letter of May 19, during his May 23 conversation with Brenner. Those notes read as follows:

"$30,000 at the time of signing contract or wont [sic] sign!
"Teddy (Try)—get back to me? $20,000 was best—10%—Com. Rule
"Will entertain Arum's offer until we sign!
"Brenner—I understand, I know you would take it, I won't stop you!"

I conclude that these notes are subsequently fabricated evidence. In addition to the sheer incredibility of such a conversation taking place in this factual context (see *infra*), Luca's testimony was that when he just got the contract and the covering letter from Brenner he made some notes on it with a black felt-tip pen, which he testified he did not use after that day, using instead the blue ballpoint. However, *this* is contrary to the physical evidence in the case, for on the letter agreement, Luca's interlineations regarding closed circuit TV rights in Ohio, *necessarily made at the time of the telephone conversation*—Brenner told Luca to write it in (Tr. 46)—are made with the felt-tip pen. This clearly undermines his story that on the day of the conversation with Brenner he

*only* used a blue ballpoint pen to note, among other things, his alleged conversation with Brenner (Tr. 48–9), and leads me to the conclusion that *these* ballpoint "notes" were added thereafter and are spurious. Luca also testified before me that he told Brenner about Arum being in the picture even *before* sending the telegram on May 17 (Tr. 64). This is squarely contradicted, however, by his earlier statement to the New York State Athletic Commission (Tr. 65) to the contrary.

6. However, *I* read his testimony before the Athletic Commission of June 13, 1977.

7. In ¶ 8 of his affidavit, Commissioner Patterson states:

I participated in a telephone conversation in early June, 1977, among Frank Luca, Earnie Shavers' business manager, Teddy Brenner, the Garden matchmaker, and myself during which Luca stated in words or substance that he and Earnie Shavers understood that they had entered into a binding contract with the Garden and that a subsequent "agreement" with Top Rank, Inc. was signed by Luca only because Mr. Arum represented that he was working in concert with the Garden.

the Garden rather than Top Rank" (Trans. at 73).

■ On June 13, 1977, the parties, as well as Top Rank, appeared before the New York State Athletic Commission, at which time testimony was taken. On June 15, the Commission issued its opinion finding a binding contract between the Garden and Shavers, which it approved.[8] While I would in no event be bound by the Commission's decision, it obviously is in accord with my findings, and I note that the Commission has expertise in practices in the trade, which enables it to authoritatively view the acts of the parties in context.[9]

■ The relationship between the parties is clearly governed by New York law.[10] Under the law of New York and as viewed by others in this Court, the granting of negative injunctive relief in personal services contracts involving athletes is discretionary and first requires a finding by the trial court that the contract terms, including the restrictive negative covenant,[11] are not "unduly harsh or one-sided," *Connecticut Professional Sports Corp. v. Heyman*, 276 F.Supp. 618, 620 (S.D.N.Y.1967), and that the enforcement of the negative restrictive covenant would not unreasonably burden the party to be enjoined. *See Machen v. Johansson*, 174 F.Supp. 522, 531 (S.D.N.Y.1959).

■ I make such findings here. No one argues to the contrary, and I conclude that the terms of the agreement between the parties are fair and reasonable and that Shavers' purse is consistent with his being a contender for the heavyweight title. There is no question here of overreaching or unequal bargaining power between the parties. Furthermore, it would not unreasonably burden Shavers to enjoin him from fighting until October 11 or such earlier time as the agreement with the Garden is satisfied, since Shavers is protected by the required $100,000 bond plaintiff has already posted and therefore is assured of his due if he performs under the agreement with the Garden, even if ultimately he prevails in his position that there was no contract between himself and plaintiff.

Next, I conclude that plaintiff has satisfied its burden under *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973), having shown the probability of ultimate success on the contractual issue before me. Also, not only is Shavers not injured by the granting of the preliminary injunction in view of the $100,000 bond (see *supra*), but the Garden is, to a measurable extent, irreparably injured as a viable promoter of major boxing matches were Shavers with impunity able to simply disavow a prior agreement with the Garden to take advantage of a later-made more attractive offer. The Garden's credibility could be destroyed in the eyes of boxing managers, as well as various media representatives, such as television producers, or others, who, in reliance, enter into further contracts that in fact may well represent the major source of income from the event being promoted, possibly being the difference between profit and loss for the promoter. In any event, it is beyond question that the balance of hardships is in the Garden's favor.

Given the foregoing, the preliminary injunction is granted.

So Ordered.

---

**8.** By an Article 78 proceeding brought on by order to show cause in the Supreme Court of the State of New York, Top Rank is seeking to vacate the Commission's decision for lack of jurisdiction. A stay was granted, and the motion is *sub judice*.

**9.** I also note that I find it more likely so than not so that Luca had agreed with Brenner when they met at the Cleveland Airport with their lawyers on June 4 to submit the dispute to the Commission to decide.

**10.** *See Auten v. Auten*, 308 N.Y. 155, 124 N.E.2d 99 (1954).

**11.** It is beyond question that Earnie Shavers' talents are "unusual, unique [and] extraordinary" and, accordingly, a negative covenant not to fight except as provided in the agreement with plaintiff will be implied in the event it is not explicitly so provided. *Harry Rogers Theatrical Enterprises, Inc. v. Comstock*, 225 App. Div. 34, 232 N.Y.S. 1, 4 (1st Dep't 1928).