Peter **GENNARO** and Geannie Productions, Inc., Plaintiffs,

v.

Maurice **ROSENFIELD** and Lois Rosenfield, Defendants.

No. 84 Civ. 7824 (GLG).

United States District Court, S.D. New York.

Dec. 20, 1984.

---

Richenthal & Birnbaum, P.C., New York City, for plaintiffs; George P. Birnbaum, Lisa S. Horowitz, New York City, of counsel.

Miller, Shakman, Nathan & Hamilton, Chicago, Debevoise & Plimpton, New York City, for defendants; Michael L. Shakman, Ronald Barliant, Marc O. Beem, Barry A. Miller, Chicago, Ill., and Joseph Moodhe, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

In the eyes of many, Hollywood's heyday was the era of the musical, often based on the Broadway show. One of the preeminent films of that era, "Singin' In The Rain," starred Gene Kelly, Debbie Reynolds, and Donald O'Connor. This litigation concerns an apparently new phenomenon—the proposed stage adaptation of that now legendary film.

The plaintiffs, Peter Gennaro, and his company, Geannie Productions, Inc., allege that Mr. Gennaro has contracted to choreograph the proposed Broadway production of "Singin' In The Rain" for the defendant, Maurice Rosenfield. The plaintiffs claim that the defendant has breached this contract and, therefore, seek damages for breach of contract and defamation. Pres-

ently before the Court is the plaintiffs' motion for a preliminary injunction which, in essence, would prevent the defendant from engaging any other choreographer pending the outcome of the litigation. The Court must deny this motion for the reasons stated below.

## I. *Background*

The individual plaintiff, Peter Gennaro, is a choreographer and dancer. He has choreographed a number of well-known Broadway musicals, including "Fiorello," "The Unsinkable Molly Brown," and "Annie" (for which he won a Tony Award). Mr. Gennaro is also the president of the corporate plaintiff, Geannie Productions, Inc. The defendants, Maurice and Lois Rosenfield, are husband and wife. Mr. Rosenfield is a Broadway producer. Among his credits are the 1980 Broadway musical "Barnum" and the 1983 revival of Tennessee Williams's "The Glass Menagerie." In 1980, Mr. Rosenfield acquired the right to adapt "Singin' In The Rain" for stage presentation from Metro-Goldwyn-Mayer and Robbins Music Company. Rosenfield subsequently granted a license to Harold Fielding for the London production of "Singin' In The Rain."

The events [1] giving rise to the instant controversy commenced in November 1980, when Ian Bevan, a British theatrical agent and manager, contacted Mr. Gennaro's agent and attorney, Robert M. Cavallo. According to Mr. Cavallo, Mr. Bevan said that Mr. Fielding wanted Peter Gennaro to choreograph the London production. Mr. Cavallo relayed this offer to Mr. Gennaro, who allegedly said that he would agree to choreograph the London production only on the condition that he also receive the option to choreograph any first-class stage production of "Singin' In The Rain" in the United States, including any Broadway production. Mr. Gennaro alleges that Mr. Bevan proceeded to negotiate with Mr. Cavallo for Mr. Gennaro's services and with Mr. Rosenfield to obtain the desired option.

The plaintiff further alleges that an agreement was reached on both counts and that the option agreement was embodied in a January 20, 1983, letter signed by both Bevan and Rosenfield. Complaint ¶ 8.

On February 2, 1983, Mr. Fielding forwarded a copy of the January 20 letter to Mr. Gennaro along with his own letter confirming an agreement between himself and Mr. Gennaro. According to this letter, Mr. Bevan had "negotiated conditions for [Mr. Gennaro to choreograph] the American and other first-class productions of "Singin' In The Rain" which [would] be separately confirmed to [Mr. Gennaro] by the American producer, Mr. Maurice Rosenfield." Affidavit of Robert M. Cavallo, Exhibit A. On April 5, 1983, Ronald Taft, Mr. Rosenfield's attorney, forwarded a draft contract to Mr. Cavallo and requested Mr. Cavallo's comments. According to Mr. Rosenfield, this contract concerned both the London and American productions. Mr. Gennaro maintains that the April 5 draft only concerned the London production. For unknown reasons, Mr. Cavallo informed Mr. Taft that he would not comment on the draft. At the same time, Mr. Cavallo was negotiating with Mr. Fielding. On April 14, 1984, Harold Fielding, Ltd. and Geannie Productions, Inc. entered into a written agreement with regard to Mr. Gennaro's role in the London production. Mr. Gennaro alleges that this agreement formalized the January 20 letter with respect to the American production. Complaint ¶ 8.

In early June, Mr. Rosenfield visited Mr. Cavallo in his New York office. Precisely what transpired at that meeting is unclear. Soon thereafter, Mr. Cavallo sent Mr. Taft a letter commenting on the April 5 draft. There were no further discussions about that document.

The London production opened on June 30, 1983, and is still running. Mr. Gennaro has met twice with Mr. and Mrs. Rosenfield since the opening, once in June 1983, and again in December 1983. Precisely what

---

**1.** Although we have received a number of affidavits and exhibits, our understanding of the events that underly this litigation remains cloudy.

was said at those meetings is also in dispute.

During the summer of 1984, Mr. Cavallo heard that the American production of "Singin' In The Rain" was being planned and that the plans did not involve Peter Gennaro. On September 17, 1984, Mr. Cavallo sent a mailgram to Mr. Rosenfield advising him that Mr. Gennaro had elected to exercise the option to choreograph the American production. On September 20, 1984, Mr. Taft responded for Mr. Rosenfield in a letter that stated, "Mr. Rosenfield has not asked Mr. Gennaro whether he would like to choreograph the production of "Singin' In The Rain" which Mr. Rosenfield plans to produce in New York." Affidavit of Robert M. Cavallo, Exhibit D. The plaintiffs then brought the instant action by order to show cause seeking, *inter alia,* a preliminary negative injunction enjoining the defendants and their agents from

(a) producing any American first-class stage production of the musical "Singin' In The Rain" (the "American production") with choreography by any choreographer other than Peter Gennaro;

(b) entering into any contract for choreography of the American production with any choreographer other than Peter Gennaro;

(c) advertising, promoting or otherwise publicizing the American production, in print or any other media, whereby the actual or prospective choreography is represented as by any choreographer other than Peter Gennaro....

Order to Show Cause at 2.

## II. *Discussion*

■ A court will grant preliminary injunctive relief if a plaintiff can show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Lawe v. New York State Public Employment Relations Board,* 689 F.2d 378, 379 (2d Cir.1982). Even if the plaintiffs have established irreparable harm, they have shown neither a likelihood of success on the merits, nor a balance of hardships tipping decidedly in their favor.

## A. *Irreparable Harm*

■ An inadequate remedy at law is a necessary prerequisite to a showing of irreparable harm. *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir.1981). Mr. Gennaro argues that he will continue to suffer two wrongs for which money damages will not compensate: harm to his reputation and erosion of his professional skills. While it may be that the harm to the plaintiff's reputation constitutes irreparable harm, we do not believe that erosion of his skills constitutes such harm.

## 1. *Atrophy of Professional Skills*

■ Although courts recognize that atrophy of professional skills could constitute irreparable harm, *Dos Santos v. Columbus-Cuneo-Cabrini Medical Center,* 684 F.2d 1346, 1350 (7th Cir.1982), we are aware of only one case finding that, under the facts established, such atrophy constitutes irreparable harm. In that case, *Neeld v. American Hockey League,* 439 F.Supp. 459 (W.D.N.Y.1977), the court found that a young hockey player would suffer irreparable harm were he denied the right to play professional hockey during the pendency of his lawsuit challenging certain league restrictions that would have prevented him from playing. The district court noted that

[t]he denial to plaintiff of an opportunity to play professional hockey in the AHL will result in the possibility of irreparable harm to plaintiff's professional hockey career. A young athlete's skills diminish and sometimes are irretrievably lost unless he is given an opportunity to practice and refine such skills at a certain level of proficiency. Therefore, plaintiff has shown the possibility of irreparable harm if an injunction *pendente lite* is not granted.

*Id.* at 461. Mr. Gennaro argues that the alleged breach of contract will limit his opportunities for work, thereby denying him the chance to develop and refine his skills. The plaintiff's situation, however, differs markedly from the young hockey player's in *Neeld.* The plaintiff, an established choreographer with a first class reputation, will not be denied the opportunity to embark on a promising artistic career. Nor are his skills likely to diminish or atrophy. Since he has already choreographed the London production, the Broadway production represents less than a unique opportunity to develop his skills. In addition, as a top flight choreographer, he is likely to gain other work during the time he would be choreographing "Singin' In The Rain." Thus, we decline to follow *Neeld.* The plaintiff has not established that his skills will diminish so as to cause him irreparable harm.

■ Mr. Gennaro also asserts that his reputation has been irreparably harmed. In his words,

> The world of theatre is small, and its every event is illuminated by the bright spotlight of public curiosity. Reputations which have been built up over many years can be torn apart overnight when it appears that other artists are more desirable. Colleagues have been asking me why I was "replaced" as choreographer for the American production. The situation is painfully embarrassing to me and is severely damaging the first-class reputation and professional credibility I have worked so hard to establish over so many years. I have no traditional monetary remedy, since no amount of money can fully compensate me for this injury; indeed, its subtle effects can never be fully known.

Affidavit of Peter Gennaro in Support of Order to Show Cause Seeking Preliminary Injunction at ¶ 10. Several cases from this circuit establish that damage to reputation often constitutes irreparable injury and justifies injunctive relief. For example, in *Madison Square Garden Boxing, Inc. v. Shavers,* 434 F.Supp. 449 (S.D.N.Y.1977), the court found that a promoter of major boxing matches would be irreparably injured were its credibility destroyed by virtue of a boxer breaching his contract with the promoter. *See also Dino de Laurentiis Cinematografica, S.p.A. v. D–150, Inc.,* 366 F.2d 373, 375–76 (2d Cir.1966) (Damages are particularly difficult to compute when damage to reputation is present.). Similarly, Peter Gennaro has worked for many years to establish a reputation as a first class choreographer. His reputation is of great commercial value to him. The apparent replacement of the plaintiff could damage his reputation in the theatre community. Those who had thought Mr. Gennaro would choreograph the production may now hold him in lower esteem. As the plaintiffs correctly point out, such damage to reputation is difficult if not impossible to measure in money terms.

On the other hand, show business arrangements often take into account considerations other than artistic merit. One bad review cannot tarnish the image of an established artist such as Peter Gennaro. Theatre people may well find fault with Mr. Rosenfield in this situation—particularly in light of the success of the London production. This situation resembles that where a baseball manager replaces the starting pitcher in the late innings despite the fact that he is pitching a shut out and has a comfortable lead. If the relief pitcher fails, the manager looks terrible.

### B. *The Likelihood of Success on the Merits*

Setting aside the question of irreparable harm, we next consider whether the plaintiffs have demonstrated a likelihood of success on the merits. We conclude that they have not.

■ The nub of this case is a dispute over whether Mr. Rosenfield ever contracted with Mr. Gennaro. In determining whether a contract exists, the objective intent of the parties as manifested by their expressed words and deeds at the time of

the alleged contract controls.[2] *Brown Brothers Electrical Contractors, Inc. v. Beam Construction Corp.*, 41 N.Y.2d 397, 399, 393 N.Y.S.2d 350, 352, 361 N.E.2d 999, 1001 (1977). If the parties' expressions and conduct would lead a reasonable person to determine that they intended to reach a binding agreement, their agreement will be enforced. *Phillip v. Gallant*, 62 N.Y. 256, 263 (1875).

■ Mr. Gennaro asserts that the January 20 letter from Ian Bevan to Maurice Rosenfield countersigned by Mr. Rosenfield, standing alone, constitutes a binding contract. That letter states, in part:

> I write to record the heads of agreement I have reached on your behalf in negotiations with Mr. Robert M. Cavallo . . . for the services of Mr. Peter Gennaro as choreographer for the above production [ ("Singin' In The Rain") ].
>
> His services have been engaged by Harold Fielding Ltd. for the London production. . . . Subject to that production running not less than 100 consecutive performances, you undertake to offer Mr. Gennaro a contract to choreograph the first American and/or Broadway production.
>
> \*   \*   \*   \*   \*   \*
>
> This letter is to record in "heads of agreement" style the basic terms agreed between you and Mr. Gennaro, which terms will now be converted into a formal document or documents in such form as shall be to the approval of your respective legal advisers. By our respective signatures to this letter we confirm to each other and to Mr. Gennaro that the basic terms to be incorporated into the formal documentation are those outlined in this letter.

Order to Show Cause, Affidavit of Robert M. Cavallo, Exhibit A. The letter further specified Gennaro's fee and his share of the royalties. No other terms were detailed.

Acknowledging that this letter contemplated more formal documentation, the plaintiffs nevertheless contend that it constitutes a binding agreement. They rely on authority to the effect that a letter containing the essential terms of a contract may create a binding obligation although the parties may have contemplated executing a more formal agreement at a later date. *V'Soske v. Barwick*, 404 F.2d 495 (2d Cir. 1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); *Sommer v. Hilton Hotels Corp.*, 376 F.Supp. 297 (S.D. N.Y.1974). The plaintiffs argue that the evidence conclusively establishes that the parties intended the January 20 letter to be a contract. The plaintiffs point out that the letter contained the material financial terms of the deal and that Mr. Gennaro's agent made it known to Mr. Fielding that Mr. Gennaro would not choreograph the London production unless he had an option to choreograph the Broadway production. To buttress this position, Mr. Cavallo and Mr. Gennaro also offer their recollection of several conversations with Mr. Rosenfield allegedly confirming the agreement. The plaintiffs also submit a letter from Mr. Bevan that purports to support their position. Standing alone, their evidence might establish the likelihood of success on the merits.

However, the defendants make a number of points in rebuttal. They thus make clear that whether the January 20 letter is a contract is, at most, a serious question going to the merits and a fair ground for litigation.

The defendants first argue that the behavior of the parties subsequent to January 20, 1983, indicated their intention *not* to be bound by the January 20 letter. They also take issue with the plaintiffs' characterization of the January 20 letter. According to the defendants, "[t]he January 20 letter is not a contract because it expressly provides that it is to be followed by a detailed agreement to be crafted and

---

**2.** Whether English or New York law governs the contractual relations in this case is unclear. Both parties agree that neither law differs with respect to relevant contract issues. We agree and thus decline to rule at this time as to the applicable substantive law.

approved by counsel and to contain additional terms." Defendants' Reply Memorandum at 15. "[Such a]n agreement ... does not bind the parties until such documentation and approval are accomplished." *Id.* at 17. They cite *C.H. Rugg & Co. v. Street,* [1962] 1 Lloyd's List L.R. 364, 369 (Q.B.); *Reprosystem B.V. v. SCM Corp.,* 727 F.2d 257 (2d Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); and *Read v. Henzel,* 67 A.D.2d 186, 415 N.Y.S.2d 520, 523 (1979), to support this proposition. However, these cases turned not on the law, or on any hard and fast rule of contract interpretation, but rather on the particular intentions of the parties to the alleged contract.[3] Similarly, the dispute about the January 20 letter turns not on the law but on the facts. Whether the parties intended to contract is a serious question for the factfinder.

The defendants also claim that the January 20 letter is not sufficiently definite to constitute a binding agreement. Under the general principles of contract law, there can be no contract if the parties fail to agree on all the essential terms. *Interocean Shipping Co. v. National Shipping and Trading Corp.,* 462 F.2d 673, 676 (2d Cir.1972). The January 20, 1983, letter specifies only the fee and royalty terms. Mr. Cavallo asserts that this accords with industry practice, an assertion that the defendants vigorously dispute. We are not sure who has the better of this dispute, but we are certain that the plaintiffs have not demonstrated that they are likely to prevail.

The plaintiffs also argue that, even if the January 20 letter is too indefinite to constitute a contract, the April 14 long form agreement between Geannie Productions, Inc. and Harold Fielding Ltd. is sufficiently definite. This detailed agreement contains the essential terms necessary for a binding contract. However, the defendants argue that Fielding lacked actual or apparent authority to bind Rosenfield. In rebuttal, the plaintiffs argue that, even if Fielding lacked actual authority, he had apparent authority. The Restatement (Second) of the Law of Agency § 8 defines apparent authority as "the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." *Restatement (Second) of the Law of Agency* § 8. According to Mr. Gennaro, Mr. Rosenfield manifested Mr. Fielding's authority in his January 20 letter. The defendants, of course, reject this contention. They claim that the plaintiffs have alleged no act by Mr. Rosenfield whereby he conferred authority upon Mr. Fielding to act as his agent or whereby he communicated that authority to Mr. Gennaro or Mr. Cavallo. Again, the facts are so vague that to draw any conclusion with regard to the likelihood of either side prevailing on the authority issue is impossible.

Finally, the defendants argue that, even assuming *arguendo* that the January 20 letter constitutes a valid agreement, Mr. Gennaro breached that agreement when his agent, Mr. Cavallo, refused to comment on the April 5 draft contract. However, the plaintiffs' response undercuts the defendants' position. As noted above, Mr. Gennaro maintains that the January 20 letter in and of itself constituted a contract. Therefore, he had no duty to negotiate with Mr. Rosenfield and did not breach his contract when he refused to comment on the April 5 draft. In addition, Mr. Gennaro offers another credible explanation for his refusal to comment. The April 5 draft concerned, at least in part, Mr. Gennaro's obligations with respect to the British production. The plaintiffs argue that, since Mr. Cavallo was already negotiating with Mr. Fielding about that production, the April 5 draft contract was duplicative and unnecessary. However, this argument is undercut by the plaintiffs' failure to explain Mr. Cavallo's June 15 letter to Mr. Taft reviewing the April 5 contract. Whether Mr. Cavallo's refusal to comment constituted a breach is

**3.** *See supra* note 2.

thus as unclear as the other matters in dispute.

The foregoing discussion leaves no doubt that the plaintiffs have not established the likelihood of success on the merits. There exist too many unresolved factual questions to justify any such conclusion.

### C. *The Balance of Hardships*

■ Given our conclusion regarding the likelihood of success on the merits, we may grant the requested relief only if the plaintiff can "show that the harm which he would suffer from the denial of his motion is 'decidedly' greater than the harm which [the defendants] would suffer if the motion was granted." *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir.1981). In this case, the balance of hardships does not tip decidedly in favor of the plaintiffs. We therefore decline to grant the requested relief.

If the motion is denied, the plaintiffs may suffer some additional irreparable harm. However, even if we accept Mr. Gennaro's assertion of irreparable harm, most of the damage to his reputation has already been done. No doubt, if we grant the requested relief, a group of individuals who would otherwise learn of Mr. Gennaro's alleged dismissal will remain uninformed (assuming the defendants choose to go ahead with the production). A denial of injunctive relief will harm the plaintiff's reputation among this group. However, the plaintiff's primary concern is his reputation among those in the theatre industry. That group is well informed, and has by now learned of this controversy. Thus, the denial of injunctive relief will do little to mitigate the total harm the plaintiff will suffer as a result of his alleged replacement.

On the other hand, should we grant the requested relief, the defendants will have two choices. They may hire Mr. Gennaro, or abandon the production. Abandonment, while not unrealistic—given the assertions

to this effect in Mr. Rosenfield's papers—would constitute self-inflicted harm. We do not believe such harm is cognizable or relevant to our determination. Assuming Mr. Rosenfield opts to have Mr. Gennaro choreograph his production, Mr. Rosenfield would find himself in the uncomfortable position of working closely with someone whom he allegedly had replaced, had litigated against, and had no desire to work with. In addition, Mr. Rosenfield would be forced to abandon any discussions or contract into which he might have already entered with another choreographer. He would then suffer the obvious consequences of such an action. In our view, the defendants will suffer at least as much if not more harm from a grant of injunctive relief than the plaintiffs will suffer from a denial.

Although our judgment about the relative harms each party would suffer is subjective, we think it clear that the plaintiff has failed to show that the balance of hardships tips decidedly in his favor. *Buffalo Forge Co. v. Ampco-Pittsburgh Corp., supra*, 638 F.2d at 569. Therefore, we decline to grant the requested prohibitive injunctive relief.[4]

### III. *Conclusion*

The plaintiffs' motion for preliminary injunctive relief is denied. We will endeavor to schedule a trial of the factual issues as soon as the parties indicate that they have completed discovery and are ready.

SO ORDERED.

---

**4.** Given our holding, we need not decide if and when negative injunctive relief will issue to force an employer to abide by a personal servic-

es contract. *See generally Restatement (Second) of the Law of Contracts* § 367, Illustration 2.