**USA NETWORK, Plaintiff,**

v.

**JONES INTERCABLE, INC., Defendant.**

**No. 88 Civ. 6895 (KC).**

United States District Court,
S.D. New York.

Jan. 19, 1989.

Richard Davis, Joseph Fortner, Jr., Weil Gotshal & Manges, New York City, for plaintiff.

John S. Martin, Jr., Howard O. Godnick, Schulte Roth & Zabel, New York City, for defendant.

## OPINION AND ORDER

CONBOY, District Judge:

### BACKGROUND

Plaintiff ("USA") is a cable television network. As such it acquires the right to cablecast television series, sporting events, movies, and additional fare from producers and other sources. USA, in turn, enters into affiliation agreements with cable systems operators who, for a fee, receive the right to carry USA Network over their systems. Each affiliate is charged a certain amount for every subscriber receiving USA in the affiliate's systems. Thus, USA fee revenues increase as its affiliates' subscriber base with access to USA expands. USA also derives revenue from advertisers who promote their products nationally on the network. The fees charged advertisers are based upon the size and demographic makeup of the network's viewership.

Defendant ("Jones") operates 94 cable systems in 21 states and is the sole cable systems operator in the vast majority of its markets. In the argot of the industry, a company of Jones' size is called a Major Systems Operator ("MSO"). By a written agreement and contemporaneous letter amendment dated September 1, 1986, USA granted Jones the right to cablecast USA Network over its systems. By its terms, the affiliation agreement was to expire on December 31, 1990. Pursuant to the agreement, Jones was obligated, *inter alia*, to a) assign a single channel for USA on each of its cable systems b) use its best efforts to promote and maximize the sale of USA Network, and c) "distribute the USA Network Service to at least seventy-five percent of the aggregate number of subscribers to its ... systems." (Agreement para. 4(d)). The agreement set specific rates to be paid by Jones but provided a mechanism, in paragraph 6(d), for increasing the rates, subject to Jones' right to terminate if dissatisfied with the increase:

On three (3) months' advance written notice, USA may change the rates, if any, set forth on the Basic Service Schedule or Tiered Service Schedule, as the case may be. If such change increases the rate payable by Affiliate with respect to subscribers in a CATV system, then Affiliate may notify USA, within thirty (30) days of the giving of such notice, that Affiliate regards such change as unacceptable and wishes to terminate this Agreement solely with respect to any CATV System as to which such increase is applicable. In the event that Affiliate so notifies USA that such change is unacceptable under the provisions under the provisions of this Section 6(d), this Agreement shall terminate on the date such proposed change becomes effective, unless within thirty (30) days of receiving Affiliate's notice, USA notifies Affiliate that USA has decided not to make such proposed change.

Paragraph 9 prescribes the manner in which notices under the Agreement are to be given:

*Notices:* Except as set forth below, all notices hereunder shall be in writing and delivered by hand or sent by certified mail return receipt requested, telegram or private wire to the receiving party at its address set forth above or at such other address as such party shall have designated by a notice given in accordance with this section.... Notice given by mail shall be considered to have been given five (5) days after the date of mailing....

Although Jones was obligated only to provide USA to at least 75% of its subscribers regardless of the type of service and regardless of the actual number of subscribers to Jones' systems, that portion of the affiliation agreement contained in the letter amendment created incentives for Jones either to provide USA Network as part of a basic cable system rather than a tiered system or to provide USA to at least one million overall subscribers. A basic

cable system is comprised of those channels provided to subscribers who pay the minimum fee for cable access. A tiered cable system is comprised of those channels provided to subscribers who pay a premium over the fee paid for the basic system. If Jones provided USA as part of a basic system to at least 80% of its subscribers or if USA were made available to the bench mark one million figure, then, according to the letter amendment, Jones' affiliation fee would be reduced. The letter amendment also put a cap on rate increases over the term of the agreement. If Jones met the one million bench mark figure, USA could not set rates that exceeded 9.5 cents by more than 60% during the remainder of the agreement. If Jones did not meet the bench mark, USA could not set rates that exceed 11 cents by more than 60% during the remainder of the agreement.

By letter dated June 27, 1988, USA announced that its rate would be increased by $.05 as of January 1, 1989 and by an additional $.05 as of January 1, 1990. It appears that the latter increase, if implemented, would violate the rate cap set forth in the September 1, 1986 letter amendment. By letter dated August 1, 1988, Jones informed USA of its desire to terminate the affiliation agreement pursuant to Paragraph 6(d). Despite some initial skirmishing, Jones has conceded that its notice of termination was intentionally backdated. Apparently, the letter was drafted on August 9 and mailed on August 10. Thus, by the literal terms of the affiliation agreement, Jones' termination notice was roughly twelve days late.

Representatives of both organizations met several times in August and September to settle their differences but to no avail. On September 28, 1988, Jones' president advised USA that effective October 3, 1988—the first day of the Fall television season—USA would be cancelled on cable systems constituting 65% of Jones' subscribers. Later the same day Jones' president held a press conference to announce Jones' discontinuance of USA on the majority of its systems, professedly because of the predominance of violence and broad-cast-television reruns in USA's programming. Jones also announced that USA would be replaced by Turner Network Television ("TNT"), of which Jones is a shareholder.

On September 29, 1988, USA commenced the instant action against Jones and filed a contemporaneous motion for an order temporarily restraining and ultimately enjoining Jones from terminating USA pending the outcome of the action. Initially and throughout the proceedings to date, the near exclusive focus of USA's argument on irreparable injury, both in emphasis and content, was the adverse impact of Jones' actions on USA's standing with program suppliers, advertisers, and other major cable systems operators affiliated with plaintiff. After a hearing on September 30, the Court denied plaintiff's request for a temporary restraining order pending the outcome of the preliminary injunction motion. On the merits of the complaint, the Court found that plaintiff would likely demonstrate that the defendant's October 3 reduction in carriage of USA breached the affiliation agreement. The Court also found, however, that defendant would likely demonstrate its right to terminate the agreement as of December 31, 1988 or, at a minimum, that defendant had demonstrated a fair ground for litigation on this issue. With respect to irreparable harm, the Court found that USA stood to lose only a marginal percentage of its national access to cable subscribers; the principal injury complained of, the damage to its reputation flowing from industry-wide knowledge of Jones' dissatisfaction with USA, could not be repaired after the fact by a restraining order; to the extent that prospective damages had been adequately demonstrated, no showing was made that they could not be redressed by money damages; and, to the extent that broad, long-term noncompensable damages to reputation were asserted, they were too remote and speculative to justify injunctive relief. After further submission of memoranda and affidavits, the Court conducted a preliminary injunction hearing on November 18, following which

the Court took plaintiff's application under advisement.

## DISCUSSION

### IRREPARABLE INJURY

 The standard for obtaining a preliminary injunction in this circuit is well established and undisputed. The moving party must demonstrate a) that it will suffer irreparable harm in the absence of injunctive relief and b) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *United States v. Bedford Associates,* 618 F.2d 904, 912 n. 15 (2d Cir.1980); *Jackson Diary, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). Also undisputed, but worthy of repetition in this case, is that a preliminary injunction is an extraordinary remedy not to be routinely granted. *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). It should issue not upon a plaintiff's imaginative, worst case scenario of the consequences flowing from the defendant's alleged wrong but upon a concrete showing of imminent irreparable injury. *State of New York v. Nuclear Reg. Comm'n,* 550 F.2d 745 (2d Cir.1977) ("award of preliminary injunctive relief can and should be predicated only on the basis of a showing that alleged threats of irreparable harm are not remote or speculative but are actual and imminent"); *Jack Kahn Music v. Baldwin Piano & Organ,* 604 F.2d 755, 759 (2d Cir.1979) ("mere speculation that there is a possibility that the party seeking the injunction may in some unproved way suffer loss or damage" is insufficient).

The propriety of injunctive relief also depends, in part, upon the nature of the rights being enforced. In the contract setting, injunctive relief, both interlocutory and final, is the exception and not the rule. "Ordinarily, the innocent party to a breached contract is entitled only to compensatory damages obtainable in an action at law; but if, due to exceptional circumstances, an action at law cannot afford adequate relief, equity will specifically enforce the contract, if its terms are such that they do not impose upon the court any difficulty in enforcement, and the contract in other respects does not violate the rules pertaining to actions for specific performance, and there are no facts or circumstances connected with the inception or continuance of the contract which would render it contrary to equity to require its specific performance." 55 N.Y.Jur. Specific Performance § 8 at 439 (1967). *See Litho Prestige v. News America Publishing, Inc.,* 652 F.Supp. 804, 809 (S.D.N.Y.1986) ("The specific performance remedy ... remains largely limited to contracts where the traditional remedy of damages is inappropriate because the unusual goods or services involved are difficult to value."). Specific performance is particularly undesirable and impractical where it would force essentially hostile parties into an ongoing, active business relationship. *Id.* at 809–10.

 One exceptional circumstance warranting injunctive relief in a contract action exists where the prospective breach, if unrestrained, threatens the destruction or catastrophic impairment of an ongoing business. *See John B. Hull v. Waterbury Petroleum,* 588 F.2d 24, 28–29 (2d Cir. 1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979). Mere disruptions in business, however, though perhaps substantial, do not fall within this exception. *See Corning S & L Ass'n v. Federal Home Loan Bank Bd.,* 562 F.Supp. 279, 283 (E.D.Ark.1983) ("Monetary loss may constitute irreparable harm only where the movant's very existence is threatened, i.e., where an act threatens an ongoing business with destruction as opposed to mere disruption."); *Newport Tire & Rubber v. Tire & Battery,* 504 F.Supp. 143, 150 (E.D. N.Y.1980) ("a moving party possesses an adequate remedy at law if the act at issue threatens only a *disruption* in an ongoing business, and not its destruction"); *In re Misty Touch,* 31 B.R. 853 (S.D.N.Y.1983) (if the wrongful activity threatens only the disruption as opposed to the destruction of an ongoing business, an adequate remedy at law in money damages exists and irreparable injury is absent). *See also Wiscon-*

*sin Gas Co. v. F.E.R.C.,* 758 F.2d 669, 674 (D.C.Cir.1985) (economic loss does not in and of itself constitute such irreparable harm as required to support injunctive relief).

■ It is fair to say that the termination of USA from Jones' systems will not devastate or threaten the very existence of plaintiff's business. As counsel for USA has conceded, the issue in this action is not corporate "life or death" for USA, Tr. at 20, nor could such an assertion seriously be made. USA reaches approximately 45 million cable subscribers nationwide. That figure represents a 27% increase in viewership over the last two years, and in its own forecasts, both before and after Jones' termination announcement, plaintiff predicts healthy expansion. Jones has approximately one million subscribers, about 830,000 of whom receive USA network either as part of their basic package or in a tiered service. In other words, the number of Jones' subscribers who receive USA Network represent less than 2% of cable television viewers with access to USA. The guaranteed minimum fees due USA over the remaining term of the affiliation agreement can, of course, "be calculated to the last cent," *Litho Prestige,* 652 F.Supp. at 809, and the proportional loss of advertising revenue should be readily susceptible to computation as well. In short, USA has not and cannot rely on the direct, obvious damages flowing from Jones' alleged breach to support its request for injunctive relief.

Instead, USA has emphasized what the parties and the Court have referred to as the "ripple effect," or consequential damages, of Jones' actions. Principally, USA maintains that Jones' actions will have a real but incalculable effect on its status and performance in the industry vis a vis other cable systems operators, advertisers, and program suppliers. The theory is that Jones' abrupt, highly publicized, and unprecedented termination of USA will alter its image from that of a growing, vibrant leader in the industry to that of a troubled, vulnerable participant. According to USA, once program suppliers perceive that it is wounded, USA will not get that "important first look," Tr. at 9, at new programming, which is critical to continued leadership in the industry. USA has cited specific examples of pending negotiations for select programming the procurement of which is allegedly seriously jeopardized by Jones' actions.

Program suppliers, as well as advertisers, USA asserts, also will be discouraged by the apparent lack of sanctity in USA's affiliation contracts because they will henceforth be unable to rely on a predictable number of subscribers. Finally, USA complains, other major cable systems operators will smell blood and exact pricing concessions from USA that they would otherwise be unable to demand. In effect, USA posits a commercial domino theory whereby a relatively small, compensable contract breach will gradually but inevitably lead to its irreversible descent to second-rate industry status.

If the Court were convinced that USA would suffer the so-called ripple effect injuries to any significant degree, injunctive relief would, perhaps, be appropriate. Where damages are theoretically available but, because of the nature of the injury, are not measurable with a reasonable degree of accuracy or are otherwise impractical, the legal remedy is inadequate. Dobbs, Remedies § 2.5 at 58 (1973). It must be emphasized, however, that almost every contract breach will generate some consequential damages that are difficult to calculate. *See Litho Prestige,* 652 F.Supp. at 809 ("Defendant's termination may result in some costs which are difficult to quantify ... but such costs may arise in any case where one party terminates a contract."). As the Court of Appeals for the Seventh Circuit observed:

[T]he irreparability that comes from the difficulty of proving damages is not of the same order as that which comes from the uncollectibility of a damage judgment. The award of damages in a case where injury is difficult to measure is as likely to overcompensate as to undercompensate the injured party.... [T]he plaintiff is as likely to do better than he expects as he is to do worse, but he

would lose more utility by losing big than he would gain utility by winning equally big. So there is a harm, but probably not a big one.

*American Hosp. Supply v. Hospital Products Ltd.,* 780 F.2d 589, 597 (7th Cir.1986). "Consequently, the necessity in many cases of making an informed, perhaps rough, approximation of damages does not render the legal remedy inadequate. It is only where damages are *"clearly* difficult to assess and measure,'" *Gibson v. I.N.S.,* 541 F.Supp. 131, 135 (S.D.N.Y.1982) (quoting *Danielson v. Local 275,* 479 F.2d 1033, 1037 (2d Cir.1973)) (emphasis added), that equitable relief is appropriate. After careful consideration of the affidavits, deposition excerpts, hearing transcripts, and memoranda on file, the Court is convinced neither of the fact nor the immeasurability of the so-called ripple effect damages.

First and foremost, USA's forecast of the consequences of Jones' actions beyond the immediate loss of fees and proportional advertising revenues is, if not wholly remote and speculative, vastly exaggerated. "Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time,' *Connecticut v. Massachusetts,* 282 U.S. 660, 674, 51 S.Ct. 286, 291, 75 L.Ed. 602 (1931); the party seeking injunctive relief must show that '[t]he injury complained of [is] of such *imminence* that there is a "clear and present" need for equitable relief to prevent irreparable harm.' *Ashland Oil, Inc. v. FTC,* 409 F.Supp. 297, 307 (D.D.C.), *aff'd,* 548 F.2d 977 (D.C.Cir.1976)." *Wisconsin Gas Co.,* 758 F.2d at 674. Perhaps the most difficult logical hurdle confronting USA in this regard is the presence in its various affiliation contracts of termination options triggered by proposed rate increases. USA knew when it announced its industry-wide rate increases that Jones and other major systems operators might elect to cancel their contracts.[1] This is not simply a deduction drawn from the terms of plaintiff's affiliation agreements but rather is confirmed by the deposition testimony of a former high level executive at

USA, Gil Faccio. Mr. Faccio stated that a certain amount of attrition had to be anticipated as a result of the rate increase and that, at worst, he predicted a possibility of losing between 1 and 2 million subscribers. In his estimate at the time, however, "[t]he gain in dollars would have more than made up for the loss of disaffiliation." Faccio Deposition at 76. Mr. Faccio reported his assessment to Kay Koplovitz, the President and Chief Executive Officer of USA Network. Ms. Koplovitz did not strongly disagree with Faccio's prediction of lost subscribers although she was of course "quite negative about losing 1 to 2 million subscribers." Faccio Deposition at 75. Documents produced during the course of discovery bolster Mr. Faccio's testimony, reflecting USA's expectation of significant and steady subscriber and advertising growth. Some of these projections were made after Jones' highly publicized termination announcement. In effect, USA believed that any disaffiliation would be contained, would not generate a significant adverse reaction on the part of program suppliers and advertisers, and would be more than offset by increased revenues. In light of the relatively minor decrease in business involved, and USA's evident lack of strategic concern over a chain reaction of disaffiliations and other adverse industry repercussions prompted by the rate increase, USA has, by necessity, been forced to argue that the irreparable injury flows largely from the unprecedented, peremptory, and unjustified nature of Jones' disaffiliation rather than simply from the loss of a single MSO.

A good starting point for evaluating this argument is *Madison Square Garden Boxing, Inc. v. Shavers,* 434 F.Supp. 449 (S.D. N.Y.1977), a case which Jones argues is analogous to the present dispute. The analogy is strained. There, Madison Square Garden entered into a binding contract with defendant Ernie Shavers pursuant to which Shavers would fight Muhammed Ali for the heavyweight boxing championship of the world at the Garden,

---

1. As USA's expert, John Schneider, stated, USA is currently in the midst of negotiations with a number of MSOs over the recently announced rate increases. Schneider Affidavit at 6.

the fight to take place between September 1, and October 10, 1987. The contract included an express non-competition clause. In reliance upon the contract, the Garden entered into a multi-million dollar agreement with a television network to broadcast the fight. After Shavers received a competing offer for a different fight, he tried to back out of his commitment to the Garden. The Garden sued Shavers in this district and sought an injunction preventing Shavers from participating in any other matches until he fulfilled his prior commitment to the Garden. The Court granted the injunction because, *inter alia*, the Garden would be:

> irreparably injured as a viable promoter of major boxing matches were Shavers with impunity able to simply disavow a prior agreement with the Garden to take advantage of a later-made more attractive offer. The Garden's credibility could be destroyed in the eyes of boxing managers, as well as various media representatives, such as television producers, or others who, in reliance, enter into further contracts that in fact may well represent the major source of income from the event being promoted, possibly being the difference between profit and loss for the promoter.

*Id.* at 452.

Besides the obvious difference between the two cases—the plaintiff there did not seek a mandatory injunction forcing Shavers to fight but a negative one preventing participation in competing matches—the potential injury there was substantially different in kind an quality. For one thing, the cancellation of the fight would have caused the complete forfeiture of the benefit of the collateral contracts entered into in reliance on it. Those contracts were premised on the occurrence of a highly publicized, singular event—a heavy weight title bout with Muhammed Ali—which was jeopardized by the defendant's conduct. Our case would compare with the *Shavers* case if USA's program suppliers and advertisers were suddenly faced with the cancellation of USA on all cable systems nationwide. Or conversely, *Shavers* would be analogous to the case at bar if the Garden

sought to enjoin the breach of a minor preliminary bout rather than the heavyweight title fight itself. This is because advertisers and program suppliers do not contract with USA in reliance upon any single, short-term affiliation agreement but upon USA's overall market position, subscriber base, and long term growth prospects. See Schneider Affidavit. A mere 1% decline in USA's audience is hardly an immediate, dramatic disappointment to advertisers and program suppliers who contract nationally with USA.

In addition, unlike the third parties in *Shavers*, program suppliers and advertisers could not reasonably assume, given the nature of USA's affiliation contract, that USA's affiliate base would remain completely stable over time. It is simply inconceivable that sophisticated industry participants do not anticipate minor, perhaps temporary, downward fluctuations in the network's viewership over the entirety of their relationships with USA due to proper invocation of affiliates' termination rights, fortuitous circumstances like breaches, or even natural fluctuations in viewership in the aggregate during the course of USA's affiliation agreements. It is even more difficult to accept that the termination by an affiliate who represents 1% of USA's viewers would necessarily have been an anticipated, albeit unfortunate, contingency in the eyes of USA's clients on July 28, but became a catastrophic blow to their perception of USA's reliability only 12 days later. The bottom line is, the prospective breach in *Shavers* would in and of itself have been devastating to the Garden and derivatively to third party contractors. It is not claimed here that what may be a temporary loss of 800,000 viewers profoundly impacts on USA's clients. Rather, USA asks the Court to speculate that its clients will, as a result of the breach, be overcome with the kind of long-term pessimism about USA that USA itself declares here. There is no evidence to support such speculation.

If an appropriate comparison is to be made with another case, it is with *Gennaro v. Rosenfield*, 600 F.Supp. 485 (S.D.N.Y. 1984). There, the plaintiff, an established

Broadway choreographer and dancer, sought an injunction preventing a producer from hiring a different choreographer for a particular show. Plaintiff, who choreographed the London production of the show, claimed that the producer already had a binding commitment to allow him to choreograph the New York run. He also asserted that he might be irreparably injured if the producer were permitted to hire another choreographer. Gennaro's affidavit submitted in support of his request for injunctive relief sounds surprisingly similar, in substance, to USA's papers:

> The world of theatre is small, and its every event is illuminated by the bright spotlight of public curiosity. Reputations which have been built up over many years can be torn apart overnight when it appears that other artists are more desirable. Colleagues have been asking me why I was "replaced" as choreographer for the American production. The situation is painfully embarrassing to me and is severely damaging the first-class reputation and professional credibility I have worked so hard to establish over so many years. I have no traditional monetary remedy, since no amount of money can fully compensate me for this injury; indeed its subtle effects can never be fully known.

*Id.* at 489. The court did not reject plaintiff's concerns out of hand but ultimately remained unconvinced:

> The apparent replacement of the plaintiff could damage his reputation in the theatre community. Those who had thought Mr. Gennaro would choreograph the production may now hold him in lower esteem. As the plaintiff correctly point out, such damage to reputation is difficult if not impossible to measure in money terms.
>
> On the other hand, show business arrangements often take into account considerations other than artistic merit. One bad review cannot tarnish the image of an established artist such as Peter Gennaro. Theatre people may well find fault with Mr. Rosenfield in this situation —particularly in light of the success of the London production.

*Id.* at 489. Judge Goettel's reasoning applies with greater force here. Given USA's track record, projections of future growth, status in the industry, and the relatively minor portion of its business represented by Jones, it is highly unlikely that Jones' "bad review" will tarnish USA's image. Notwithstanding Jones' self-serving public statements about its motives for terminating USA, a cable network's industry position does not seem to turn on its fragile, subjective "artistic" reputation but on a cold, hard analysis by MSO's, suppliers, and advertisers, of the network's ratings and fees. Indeed, in light of the apparent lack of contractual justification for Jones' actions, its intentional backdating of the termination letter, and its apparent, though unstated, motive to boost TNT at the expense of USA, it seems more likely that Jones' reputation for reliability, as well as for honorable business conduct, may be tarnished rather than USA's.

USA's argument that Jones' actions, if unrestrained, will send a message that there is no sanctity to affiliation agreements is also flawed. Given the prospect of a large damage award in this case, it is simply incorrect to assert, as counsel for plaintiff has, that without an injunction Jones will be able to expend "a little" money to buy out its contract obligation, thereby creating a prejudicial precedent. Putting aside for the moment the question of consequential damages, USA's direct damages over the life of the contract are not insubstantial. The Court also believes that Jones would be able to recover a significant portion of its ripple effect damages if they occur. A "plaintiff is entitled to damages at law and this would be adequate if damages could be measured with any reasonable degree of accuracy." D. Dobbs, Remedies § 2.5 at 58 (1973). "Courts have shown an increased willingness to award special damages.... [and] lost profits, subject always to the requirement that some rational basis for computation is furnished." *Id.* § 3.3. This is particularly true where, as here, the plaintiff is an established business with a track record. *Id.* § 3.3 at 152. *See, e.g., S & K Sales Co*

*v. Nike, Inc.*, 816 F.2d 843 (2d Cir.1987). Especially in an industry like this where rates and other business decisions are based on highly sophisticated methods of measuring market performance, establishing a connection between Jones' breach and a diminution in plaintiff's overall advertising rates and MSO fees should not be daunting. In this case, plaintiff would be aided by the principal that a court should be flexible in assessing the sufficiency of the evidence supporting a damage award where it is the defendant's wrongful conduct which thwarts precise calculations. *Strobl v. New York Mercantile Exchange*, 582 F.Supp. 770, 779 (S.D.N.Y.1984); *Sarlie v. E.L. Bruce Co.*, 265 F.Supp. 371, 375–76 (S.D.N.Y.1967). Thus we are talking not only about significant direct damages but potentially momentous consequential damages as well. Hardly a signal that MSOs can breach their contracts with impunity. Additionally, whether USA will be compensated by specific performance or a monetary award will have no influence on those MSOs who are or would be in a position to timely terminate USA pursuant to their own affiliation contracts.

Finally, if, as USA has argued, the ripple effect damages will result from the perception that something must be terribly wrong with USA for a MSO to take the unprecedented step of suddenly, wrongfully, and with little notice terminating its affiliation agreement, an injunction will in no way ameliorate the damage. An injunction can of course put USA back on Jones' systems. What it cannot do is compel Jones to withdraw its criticism, erase the knowledge of that criticism from the minds of advertisers, suppliers, or other MSO's, or operate as an artificial market force, restoring to USA the intangible degree of leverage it may or may not have lost as a result of Jones' highly publicized actions and statements. If plaintiff is seriously injured by the perception that a MSO does not think a network is worth the price they are charging, even at the risk of facing a damage award for a breach, coercing Jones to accept USA for at most two years will not undo the perception.

In any event, the outcome of USA's negotiations for the Master's Tournament highlights the lack of foundation for USA's dire predictions. In her supplemental affidavit in support of a preliminary injunction, Kay Koplovitz stated that USA was negotiating for the rights to cover the 1989 Masters Tournament, a prestigious event which USA has covered since 1982 the loss of which "would be both incalculable and very significant." Koplovitz Affidavit at 3. Because the tournament operators, in considering who should get coverage rights, traditionally consider whether a network is expanding, and, more critically, because Jones operates the cable system in Augusta, Georgia, the location of the tournament, Jones unrestrained cancellation of USA, in Ms. Koplovitz's view, "would make nearly impossible USA's negotiations with Augusta national." *Id.* at 3. Yet the Court has since been advised that USA retained the Masters, notwithstanding the adverse TRO decision and the uncertainty as to USA's injunction application. USA's procurement of the Master's confirms what was said about a similar contention in *Litho Prestige*, 652 F.Supp. 804:

> Plaintiff's argument that termination will cause plaintiff to lose at least one nearly finalized contract also lacks merit. Plaintiff has not described the allegedly impacted negotiations in anything but the most vague and unspecified terms.... As a practical matter businessmen cannot turn to the courts for injunctive relief whenever some event threatens a future business relationship which may occur only after years of negotiations, if at all.

*Id.* at 809. The fact remains that despite the denial of plaintiff's request for a Temporary Restraining Order, the uncertain status of this application, and the more than three month duration of this controversy, the Court has received no indication, in concrete terms, that USA's long term market position has or will decline.

A distinct, though clearly subordinate, argument offered by USA is that access to the cable television viewing public in Jones' territory is the essence of its affiliation agreement with Jones and that such access

cannot be compensated by a damage award. The problem with this argument is that it distorts the nature of the contract and wholly ignores plaintiff's actual concerns as reflected in its affidavits and depositions. Although presence on the air is certainly an element of the affiliation contract, I am not convinced that it is the essence of the contract from USA's perspective. First, reducing the affiliation agreement to its essence, one might more aptly characterize USA as a seller, or a lessor, of a programming product rather than a purchaser of air time. The central character of the contract is a grant of broadcasting rights by USA in exchange for a fee. It is true, of course, that the agreement does not allow Jones to let its rights lay dormant; Jones must meet certain minimum carriage and marketing obligations. But those obligations simply translate into guaranteed minimum fees plus probable growth, and as an ancillary benefit, a guaranteed proportional amount of advertising revenues. In essence, the contract here is about money. As such, USA's situation and injury is a far cry from that of the plaintiff in *Rose v. Brown*, 186 Misc. 553, 58 N.Y.S.2d 654 (Sup.Ct. Monroe C'ty 1945) who paid a radio station $112 to air 2 political broadcasts on fixed dates and times, apparently on the eve of an election.

More importantly, the Court is not constrained to consider purely theoretical categories of irreparable injury that are not, in fact, the concern of the injured party. Nowhere in USA's supporting affidavits is it asserted that USA's presence on Jones' systems is inherently invaluable. *Cf., e.g.,* Restatement Contracts 2d § 360 at 171 (1981) ("Some types of interests are by their very nature incapable of being valued in money. Typical examples include heirlooms, family treasures and works of art that induce a strong sentimental attachment."). Instead, plaintiff's affiants have focussed exclusively on the adverse *consequences* of USA's lack of access to Jones' systems—consequences we have already discussed at length. I note as a final matter that in *HBO v. Northlands Communication*, 14 Med.L.Rptr. 1142, a case similar to the instant dispute—the court did not, as USA asserts, acknowledge the inherent uniqueness of cable access but found, under the particular circumstances of the case, that "[i]t was not practical to calculate Home Box Office, Inc.'s, damages over the remaining life of the contract with reasonable certainty." *Id.* at 1144. I believe USA's damages over the life of the contract can be calculated with reasonable certainty, and thus that the remedy at law is adequate. *Cf. Miami Gold Productions, Inc. v. Gannett Co., Inc.,* 593 F.Supp. 672 (S.D.N.Y.1984) (national newspaper chains's failure to note plaintiff's co-sponsorship of Michael Jackson tour in advertisements could be remedied by an award of damages).

## LIKELIHOOD OF SUCCESS ON THE MERITS

As a general rule time is not of the essence in a contract unless the contract so states. Calamari & Perillo, Contracts § 11–18 at 461 (3d ed.1987). *See, eg., id.* § 11–10 at 448 (provision of contract stating that filing of notice of claim within thirty days "shall be a condition precedent to recovery" creates an express condition precedent in the most explicit fashion). The issue had not been briefed prior to the September 30 hearing, and, relying on the general rule, the Court concluded that Jones' termination notice was probably effective notwithstanding its technical tardiness. Upon review of the parties' subsequent submissions, it is apparent that the issue is somewhat murkier.

 Under New York law, "a notice exercising an option is ineffective if it is not given within the time specified (See, e.g., Restatement, Contracts 2d [Tent. Draft No. 1 1964], § 64, subd. [b]; 1A Corbin, Contracts [1963], § 264; 1 Williston, Contracts (3d Ed.1957), § 87." *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.,* 42 N.Y.2d 392, 398, 397 N.Y.S.2d 958, 960, 366 N.E.2d 1313 (1977). As Jones did not exercise its contractual option to terminate according to the literal terms of the affiliation agreement, it appears that USA is likely to establish that the agreement is still in effect. *See also* 6 Williston, Contracts § 853 at 222 (3d ed.1962) (time is of

the essence in the exercise of options, including options to terminate or cancel an existing contract).[2] Nonetheless, in the absence of irreparable injury, USA is limited to the remedy at law.

Accordingly, plaintiff's motion for a preliminary injunction is denied.

SO ORDERED.

2. There is no merit to Jones' argument that USA repudiated the agreement by announcing rate increases which exceeded the contractual cap. "The repudiation of a party's duties under a contract must. be 'positive and unequivocal' in order to establish an anticipatory breach." *Reprosystem, B.V. v. SCM Corp.,* 630 F.Supp. 1099, 1101 (S.D.N.Y.1986). I do not read USA's proposed rate increase as a positive unequivocal repudiation nor do I see how it could be so read since rate increase announcements under the contract are in reality no more than an invitation to negotiate. More importantly, USA effectively retracted the alleged repudiation weeks before Jones supposedly acted on it. A repudiation may be withdrawn if, in the interim, the other party did not elect to cancel the contract or materially change its position in reliance on the repudiation. Calamari & Perillo, Contracts § 12–9 at 464 (2d ed.1977)