INTERBORO INSTITUTE,
INC., Plaintiff,

v.

Robert J. MAURER, Individually and as President of Higher Education Services Corp.; H. Carl McCall, Individually and as Comptroller of the State of New York; Robert Attmore, Individually and as Deputy Comptroller of the State of New York; Richard P. Mills, Individually and as Commissioner of Education of the State of New York; Jeanine Grinage, Individually and as Deputy Commissioner for Higher and Professional Education of the New York State Department of Education; and Donald J. Nolan, Individually and as Former Commissioner for Higher and Professional Education of the New York State Department of Education, Defendants.

No. 96–CV–1955.

United States District Court,
N.D. New York.

Feb. 18, 1997.

Kraver & Levy, L.L.P., New York City
(David M. Levy, of counsel), for plaintiff.

Dennis C. Vacco, Attorney General for the State of New York, Albany, NY (Judith A. Avent, Asst. Atty. Gen., of counsel), for defendants.·

**MEMORANDUM–DECISION & ORDER**

McAVOY, Chief Judge.

## I. BACKGROUND AND FACTS

Before the Court today are the motion of the plaintiff, Interboro Institute, Inc., for a temporary restraining order and preliminary injunction, and the motion of the defendants, individual officers with responsibilities in the New York State Comptroller's Office, Department of Education, and Higher Education Services Corporation, to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6).

This matter arises out of the decision of the New York State Higher Education Services Corporation ("HESC") to withhold TAP and STAP (hereinafter referred to collectively as "TAP") funds from the plaintiff Interboro. The defendants claim that the withholding is necessary to effectuate an offset in the amount of $4,796,132. The sum was arrived at after an audit of Interboro for the 1989–90 through 1991–92 grant years. The plaintiff argues that the decision to seek repayment of these funds was arbitrary and capricious and motivated by the personal animus of the defendant Nolan, whom Interboro claims has been trying to shut the school down for years. The defendants, of course, claim that their actions were the result of a fair and legitimate auditing process.

Interboro is an accredited junior college located in New York City. Interboro is authorized to confer Associate in Occupational Studies degrees in six areas: accounting, business administration, paralegalism, secretarial sciences, security management and ophthalmic dispensing. Interboro's enrollment is approximately 1000 students, 95% of whom are minorities, and the majority of whom are women. More importantly, approximately 95% of the students receive TAP funds. Thus, withholding TAP funds can be expected to have a significant impact on the ability of the school to operate.

An original draft audit report proposed over $6 million in disallowances to be repaid by Interboro. The school twice submitted to OSC objections to the report and documentation in support seeking a reduction. By letter dated November 19, 1996, the New York State Higher Education Services Administration ("HESC") notified Interboro that it must refund $4,796,132 plus interest. It further informed the school that until the sum was paid or other payment arrangements were made, the State would withhold all future TAP payments, subject to offset, up to the amount of the offset.

As of December 1996, Interboro had approximately $1.172 million in funds on hand, and no other liquid assets. Interboro claims average monthly operating expenses of approximately $500,000. Thus, the plaintiff asserts that the expected costs for the spring semester are expected to exceed the school's liquid assets, thereby rendering the school insolvent, if the TAP funds are not provided by the State. The State claims that Interboro can seek a repayment schedule that would obviate the need for immediate repayment of the full amount.

Interboro further claims that the motivation behind the post-audit disallowances was fueled by the defendant Nolan, the former Deputy Commissioner of Higher and Professional Education in New York. Interboro alleges that Mr. Nolan twice tried to deny re-registration of all of Interboro's degree granting programs: once in 1985, and again in 1995. However, each time, the decision was overruled on administrative appeal to the Commissioner of Education. The plaintiff also points to certain communications between the audit personnel and Nolan during the audit process as further evidence that Nolan influenced the audit process and led to what the plaintiff claims is an arbitrary and capricious decision to demand a refund of certain TAP funds.

Also, Interboro claims that 80% of the $4.3 million sought by the State was determined to have been wrongfully paid based on a review of students' files who ostensibly did not meet the matriculation standards published in the school's catalogue. In essence, the State concluded that certain students were admitted and received TAP funding,

even though they didn't meet admissions standards published by Interboro. However, the plaintiff claims that what is published in its catalogue is not binding, because the Education Commissioner's own regulations define matriculated status as not requiring specific matriculation examinations, language examinations or other prerequisites established by the school. Also, Interboro argues that the fact that some of these students actually completed a program successfully, establishes an "ability to complete," and thus, cannot form the basis of an auditors conclusion that TAP funds were inappropriately certified by the school for those students. Interboro alleges that it was the written policy of the State Education Department ("SED") not to recommend disallowances for students who actually completed the program, even though they did not meet admissions requirements. The defendants claim that no such policy exists, and that the letter from which Interboro derives its position is misrepresented. Nevertheless, the plaintiff claims that the amount disallowed in in error, and that such error was the result of HESC and OSC purposefully failing to follow established policies and regulations, all with the intent to close down the school.

Interboro also complains that they are the victims of selective enforcement. It claims that it has been audited three times in the past six years. No other school has. The plaintiff claims that the refund sought by the State from Interboro is the most substantial ever demanded as a result of a TAP audit. The only other schools audited more than once during the last six years, according to Interboro, were business schools and proprietary institutions, such as Interboro, which are located downstate and cater to predominantly minority students. The defendants claim that many upstate schools have been audited and required to repay TAP funds. Moreover, the defendants claim that other schools have been disallowed more funds, in terms of the percentage of funds received, than Interboro.

Interboro, in addition to seeking the TRO and preliminary injunction which seek to enjoin the State from withholding TAP funds, also alleges certain claims against the defendants in a Complaint filed on December 12, 1996. Interboro sets forth two claims for relief: (1) violation of the Due Process Clause and (2) violation of the Equal Protection Clause, both under the Fourteenth Amendment. In addition, Interboro seeks attorneys fees pursuant to 42 U.S.C. § 1988.

The defendants have moved to dismiss the plaintiff's claims. It is the defendants' position that the Complaint must be dismissed on the basis of the Eleventh Amendment, on the basis that Interboro has not alleged a viable property interest in the receipt of TAP funds, that the plaintiff has not been denied due process, that the plaintiff has failed to state a claim for a violation of the Equal Protection Clause, that the defendants are entitled to qualified immunity, and that the Complaint fails to allege the personal involvement of the defendants in the alleged unlawful conduct.

## II. DISCUSSION

The Court has before it a motion by the plaintiff for a Temporary Retraining Order and Preliminary Injunction, and a motion by the defendants to dismiss the Complaint. The Court first turns to the plaintiff's motion.

### A. Temporary Restraining Order/Preliminary Injunction

The standard for granting a preliminary injunction is well-settled and undisputed.[1] "Entry of a preliminary injunction is appropriate where the party seeking the injunction establishes: (a) the injunction is necessary to prevent irreparable harm, and (b) either (i) likelihood of success on the merits, or (ii) sufficiently serious questions going to the merits of the claim as to make it fair ground for litigation, and that a balance of the hardships tips decidedly in favor of the movant."

1. The Court notes that the purpose of a temporary restraining order is to preserve the status quo and prevent irreparable harm until the Court has decided the merits of a motion for a preliminary injunction. *Warner Bros. Inc. v. Dae Rim*

*Trading, Inc.*, 877 F.2d 1120, 1124 (2d Cir.1989). Accordingly, the Court is concerned solely with the motion for a preliminary injunction at this time.

*See, e.g., Malkentzos on Behalf of MM v. DeBuono,* 102 F.3d 50, 54 (2d Cir.1996); *Resolution Trust Corp. v. Elman,* 949 F.2d 624, 626 (2d Cir.1991). However as to the second prong, "[t]he more rigorous likelihood of success standard must be met where, as here, the movant seeks to 'stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme.'" *Young Jin Choi v. U.S.,* 944 F.Supp. 323, 324 (S.D.N.Y.1996), *quoting Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989) (standard of sufficiently serious question going to the merits and balance of hardships tipping in movant's favor does not apply when movant seeks to enjoin government action taken in public interest). In this case, the governmental action is the disallowance of TAP funds pursuant to New York Education Law § 665, and the public interest is the protection of state funds. Finally, the Court is mindful that a preliminary injunction is extraordinary relief not to be granted routinely. *See, e.g., Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986); *Flexible Technologies, Inc. v. World Tubing Corp.,* 910 F.Supp. 109, 113 (E.D.N.Y.1996). With these legal standards in mind, the Court now turns to the arguments of counsel.

### 1. Irreparable Harm

"In order to satisfy the irreparable harm requirement, '[a] moving party must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by monetary damages.'" *Time Warner Cable of New York City v. City of New York,* 943 F.Supp. 1357, 1384 (S.D.N.Y. 1996), *quoting NAACP v. Town of East Haven,* 70 F.3d 219, 224 (2d Cir.1995).

The plaintiff argues that if it does not receive the expected TAP funds for the Spring semester, it will become insolvent by the Summer term, and therefore, suffer irreparable harm. In essence, the plaintiff is arguing that the action of withholding TAP funding will effectuate the destruction of an ongoing business concern, Interboro itself, and thereby cause irreparable harm. In support for this position, the plaintiff cites *U.S.A. Network v. Jones Intercable, Inc.,* 704 F.Supp. 488 (S.D.N.Y.1989), *Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co.,* 749 F.2d 124 (2d Cir.1984), and *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir.1970).

The defendants argue that the withholding of TAP funds, at worst, may lead to a disruption of business at the institution. However, the defendants point out that the plaintiff's license to operate and permission to grant degrees have not been revoked or suspended as a result of the defendants' actions. In addition, the plaintiff still is permitted to participate in the TAP program. Thus, it is the defendants' position that all that has occurred is that, after conducting an audit of the plaintiff's records,[2] certain students that the plaintiff certified as TAP eligible[3] have been determined by OSC actually to have been ineligible. Thus, the funds released on behalf of those students subsequently have been disallowed. The State now seeks a refund from the plaintiff. This is in the view of the defendants a situation for which money is plaintiff's sole remedy. Accordingly, the defendants conclude that the plaintiff will suffer no irreparable harm if TAP payments are withheld.

Rather than requiring immediate repayment of all sums, the defendants claim that the Higher Education Services Corporation ("HESC") offered the plaintiff the opportunity to make arrangements for a repayment schedule that could alleviate the financial burden of the disallowance. Specifically, the defendants point to the November 19, 1996 letter that informed the plaintiff of the disallowance of TAP funds. In that letter, HESC, through its Executive Vice President, stated "[u]ntil we receive the refund demanded in this letter, *or the school makes other repayment arrangements,* all funds payable to the school will be held, subject to offset, up to the amount of the disallowance." It is the defendants' position that this language, coupled with the fact that HESC's action did not affect TAP participation or the accredita-

---

**2.** *See* N.Y. Education Law § 665(3)(b).

**3.** The institution is responsible for certifying that a student is eligible for TAP funds. *See* N.Y. Education Law § 665(3)(a).

tion of Interboro, clearly rebuts an assertion of irreparable harm. As explained more fully below, the Court agrees with the defendants.

Looking to the case support cited by the plaintiff, the Court finds that they are not sufficiently analogous to the instant situation to offer support for the plaintiff's view.

In *U.S.A. Network*, the plaintiff therein sought a preliminary injunction to enjoin the defendant from terminating an agreement with the plaintiff. *See* 704 F.Supp. at 490. In essence, the plaintiff, a national cable network, established that if the defendant terminated their agreement, it would lose exposure to a segment of the viewing public, certain fees, and an unquantifiable measure of its reputation in the industry, i.e., goodwill. The Court denied the plaintiff's application for a preliminary injunction on the ground that "the termination of USA from Jones' systems will not devastate or threaten the very existence of plaintiff's business." *Id.* at 492. As correctly iterated by the plaintiff herein "[o]ne exceptional circumstance warranting injunctive relief in a contract action exists where the prospective breach, if unrestrained, threatens the destruction or catastrophic impairment of an ongoing business." *Id.* at 491 (citations omitted). However, the *U.S.A. Network* Court advised that "[m]ere disruptions in business, [ ] though perhaps substantial, do not fall within this exception." *Id.* (citation omitted). In addition, the Court in *U.S.A. Network* noted that preliminary injunctions "should issue not upon a plaintiff's imaginative, worst case scenario of the consequences flowing from the defendant's alleged wrong but upon a concrete showing of imminent irreparable injury." *Id., citing State of New York v. Nuclear Reg. Comm'n,* 550 F.2d 745 (2d Cir.1977).

In *Roso–Lino*, the Second Circuit reversed a District Court's denial of a preliminary injunction on the ground that the lower court incorrectly determined that it lacked the power to decide the injunction issue. 749 F.2d at 125. The Court then went on to consider the plaintiff's motion for an injunction seeking to prevent the defendant, Coca-Cola from terminating the plaintiff's beverage distributorship. The *Roso–Lino* Court

held that "[t]he loss of Roso–Lino's distributorship, an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm." *Id.* at 125–26. Of importance to the Court was the fact that if the injunction was not granted, the Rosa–Linos stood "to lose their business forever." *Id.* at 126.

In *Semmes Motors,* the Second Circuit, *inter alia,* affirmed a lower court's grant of a preliminary injunction preventing the defendant, Ford Motor Company, from terminating the plaintiff's right to own and run a Ford dealership. As stated by Judge Friendly, "Ford's contention that Semmes failed to show irreparable injury from termination is wholly unpersuasive ... [as] the right to continue a business in which [plaintiff] had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the [plaintiff and his son] want to sell automobiles, not to live on the income from a damages award." 429 F.2d at 1205.

■ In the instant case, unlike *Roso–Lino* and *Semmes Motors,* the plaintiff is not facing action that would effectively remove the *ability* of Interboro to function as a junior college. No accreditation is being removed, and Interboro is not being foreclosed from participation in the TAP program. All that is occurring is the defendants are recovering TAP funds that they have determined were wrongfully paid. Because of the amount of the disallowance, and on the assumption that it is required to immediately repay the entire amount, Interboro claims that the withholding of TAP funds will lead to its insolvency, and result in the closing of the institution. However, the Court finds that the plaintiff is seeking a preliminary injunction in this case based on a "worst case scenario." *See U.S.A. Network,* 704 F.Supp. at 491. As was stated in the November 19, 1996 letter, the act of withholding future TAP funding would be employed only until the entire refund amount is received *or until other arrangements for payment are made.* If the plaintiff contacts HESC and can agree to repayment arrangements, the insolvency of Interboro likely can be averted.

The Court also notes that New York Education Law § 665(4)(b) & (c) expressly states, in connection with institutional refunds, that the "president [of HESC] shall be empowered to: (i) require such payment immediately, (ii) *accept a repayment schedule or installment payments over a reasonable period of time,* (iii) reduce any future award received by such student by the amount of the refund due, or (iv) reduce any future payments receivable by the institution on behalf of currently eligible students by the amount of refund due ..." (emphasis added). In addition, "[t]he HESC board of trustees shall promulgate regulations governing procedures for the assertion, appeal and recovery of a refund claimed by the corporation against a student or an institution." Education Law § 665(4)(c). Thus, pursuant to statute, the plaintiff has options other than immediate repayment of the total disallowance. Moreover, Interboro has an avenue for review of the audit decision and a means for recovery of any wrongfully refunded sums. There is no indication in the record that the plaintiff has availed itself of either the repayment schedule or installment option, or of the administrative appeal and recovery option afforded it under New York law.

For the reasons set forth above, the Court cannot say that the plaintiff will be harmed irreparably if the motion for a preliminary injunction is not granted. Accordingly, the plaintiff's motion is denied.

## 2. Likelihood of Success on the Merits

Given the Court's finding that the plaintiff has failed to show irreparable harm if the preliminary injunction is not granted, the Court need not address the issue of likelihood of success on the merits.

The Court now turns to the defendants' motion to dismiss the plaintiff's Complaint.

## B. Standard For A Motion To Dismiss

On a dismissal motion for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the general rule is that the allegations in a plaintiff's complaint are deemed to be true and must be liberally construed in the light most favorable to the plaintiff. *Dahlberg v. Becker,* 748 F.2d 85, 88

(2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). A complaint should not be dismissed unless it appears beyond a reasonable doubt that the plaintiff cannot in any way establish a set of facts to sustain her claim which would permit relief. *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980); *Bass v. Jackson,* 790 F.2d 260, 262 (2d Cir.1986).

■ "[A] Rule 12(b)(6) motion is addressed to the face of the pleading. The pleading is deemed to include any document attached to it as an exhibit, Fed.R.Civ.P. 10(c), or any document incorporated in it by reference." *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985). In other words, only those documents that are specifically attached, or in some way integral to the Complaint are to be considered by the Court on a motion to dismiss. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 808 (2d Cir.1996).

It is with these legal standards in mind that the Court turns to the issues presented.

## C. Eleventh Amendment Immunity

The first issue raised by the defendants is that of the immunity of the State of New York, its agencies, and its officers who are sued in their official capacities from being subject to suit in a federal Court. It is the defendants' position that the plaintiff's Complaint only seeks monetary relief against the defendants in their official capacities.

■ It is well-settled that the Eleventh Amendment bars suits in federal Court "by private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98–99, 104 S.Ct. 900, 906–07, 79 L.Ed.2d 67 (1984) (stating the general rule that Eleventh Amendment immunity applies unless the State consents to suit, Congress expressly overrides it, or the party waives immunity). Even suits resolved in the plaintiff's favor that would have only a collateral, retroactive, or ancillary effect on the state treasury have been barred under

the Eleventh Amendment. *See Id.* at 668, 94 S.Ct. at 1358; *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87 (2d Cir. 1991). Thus, to the extent that the plaintiff seeks monetary relief against the defendants in their official capacities, such claims are barred by the Eleventh Amendment.

The plaintiff argues that the defendants mischaracterize its Complaint. Rather than seek a monetary award, the plaintiff claims that it seeks only prospective declaratory and injunctive relief against the defendants in their official and individual capacities. In addition, the plaintiff states that its claims for legal fees under 42 U.S.C. § 1988 are asserted against the defendants in their individual capacities only. For those reasons, the plaintiff argues that the Eleventh Amendment is not a bar to any claim alleged in the Complaint.

It has long been the rule that suits against state officials in their official capacity for prospective injunctive or declaratory relief are not barred by the Eleventh Amendment. *See Ex Parte Young,* 209 U.S. 123, 160, 28 S.Ct. 441, 454, 52 L.Ed. 714 (1908). Moreover, suits against state officials in their personal capacity are not barred by the Eleventh Amendment, even for actions required by their official duties. *See Hafer v. Melo,* 502 U.S. 21, 27–28, 112 S.Ct. 358, 362–63, 116 L.Ed.2d 301 (1991). In the instant case, the plaintiff claims that it seeks a declaration that the defendants acted wrongly and an Order enjoining the defendants from so acting in the future. The fact that such forward looking relief may have some effect on the treasury, it is argued, should not impose an Eleventh Amendment bar.

The Court agrees. The Eleventh Amendment bars those claims against state officials sued in their official capacity to the extent that the relief sought will have a direct or retroactive effect on the state treasury. *See Edelman,* 415 U.S. at 668, 94 S.Ct. at 1358. However, prospective declaratory and injunctive relief are not barred by the Eleventh Amendment, even if compliance with the Court order would affect the state treasury. *Id.* Accordingly, the defendants' motion to dismiss the plaintiff's Complaint, as against the defendants sued in their official capacities, is denied insofar as the Complaint seeks prospective declaratory and injunctive relief.

## D. Substantive Due Process Claim

The Court now turns to the defendants' motion to dismiss the plaintiff's first claim, that the withholding of TAP funds violates the Fourteenth Amendment. The plaintiff alleges that the defendants Nolan and Grinage have violated the plaintiff's due process rights by refusing to follow SED policies during the audit process. In addition, the plaintiff alleges that the defendant Nolan also has violated the plaintiff's due process rights by attempting to close Interboro on bases that were subsequently overturned, and by intentionally creating erroneous audit standards that were applied against Interboro. Also as part of the first claim, the plaintiff alleges that the defendant Attmore, personally and through his subordinates, acted in bad faith and with ill-will in that he refused to follow SED Commissioner Regulations, policies and procedures, and sought to punish Interboro. Finally, the plaintiff's first claim alleges that the defendant McCall should be liable for the alleged due process violations against Interboro for failing to intervene when he became aware of the violations.

To properly state a substantive due process claim, a plaintiff must identify a property interest and explain how it has been interfered with by the government. *See Greene v. Town of Blooming Grove,* 935 F.2d 507, 510 (2d Cir.), *cert. denied* 502 U.S. 1005, 112 S.Ct. 639, 116 L.Ed.2d 657 (1991); *Paul v. Davis,* 424 U.S. 693, 709, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976). A plaintiff must also allege that this deprivation was arbitrary or not reasonably related to a legitimate government interest. *See Brady v. Town of Colchester,* 863 F.2d 205, 215 (2d Cir.1988); *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993). It is important to note that "[s]ubstantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-

advised.'" *Kaluczky v. City of White Plains,* 57 F.3d 202, 211 (2d Cir.1995). The defendants argue that the plaintiff has failed to allege a valid property interest that has been interfered with by any defendant, and thus, this Court must grant the motion to dismiss the plaintiff's first claim.

### 1. Property Interest In TAP Funds

As stated in *Board of Regents of State Colleges v. Roth,* property interests are not created by the Constitution. 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). "Rather they are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlements to those benefits." *Id.* As the *Roth* Court explained, a property interest in a benefit must be based on more than a mere unilateral expectation of that benefit. The person claiming the benefit must have a legitimate claim of entitlement to it. *Id.* As stated by this Circuit

> Looking to state law, 'we focus initially on the relevant statute, regulation, or contract establishing eligibility for the government benefit at issue.' *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 581 (2d Cir.1989). If the statute, regulation, or contract in issue vests in the state significant discretion over the continued conferral of that benefit, it will be the rare case that the recipient will be able to establish an entitlement to that benefit. *Id.; R.R. Village Ass'n [v. Denver Sewer Corp.],* 826 F.2d [1197,] 1201–02 [ (2d Cir.1987) ].

*Kelly Kare, Ltd. v. O'Rourke,* 930 F.2d 170, 174 (2d Cir.), *cert. denied* 502 U.S. 907, 112 S.Ct. 300, 116 L.Ed.2d 244 (1991).

The defendants argue that the plaintiff has failed to show that it has a valid property interest in the receipt of TAP funds prior to audit. This is a critical distinction from the early cases involving institutions, TAP funding, and the existence of a property interest. Earlier cases arose in the context of a denial of the institution's right to receive funding, i.e., participation in the TAP program. *See, e.g., Midtown School of Business v. Foley,* 1990 WL 21287 *6 (N.D.N.Y.). In the instant case, Interboro has not been denied participation in the TAP program. Rather, the funds that it claims entitlement to are being withheld as an offset against disallowances determined by an audit. It is on the basis of this distinction—the denial of participation versus participation and the withholding of funds to be applied as an offset—that the defendants claim that the plaintiff cannot show that the defendants' actions have affected a property interest of the plaintiff.

The plaintiff, of course, disagrees. It is the plaintiff's contention that because the defendants had no discretion to withhold TAP funds without cause, but rather, could only do so after making a finding of wrongdoing by the plaintiff, the plaintiff has a property interest in the continued receipt of TAP award funds. *See Walz v. Town of Smithtown,* 46 F.3d 162, 168 (2d Cir.), *cert. denied* —— U.S. ——, 115 S.Ct. 2557, 132 L.Ed.2d 810 (1995); *Kelly Kare Ltd.,* 930 F.2d at 176.

The Court first notes that the issue of whether the Complaint alleges a valid property interest is not easily resolved. Even the parties themselves have tended to vacillate between two distinct alleged property interests when discussing this issue: participation in the TAP program and, assuming participation in the TAP program, entitlement to receipt of the award funds by the participating institution. As to the former, this Court itself has recognized that participation in the program is a property interest, such that its interruption raises due process concerns. *See Midtown School of Business, supra.* The Court will now consider the latter, which is an issue of first impression for the Court.

The Court first turns to the New York statutory scheme. Under the New York's Education Law, institutions are charged with the duty of certifying to HESC that each student in attendance who has applied for a TAP award is, in fact, eligible. *See* N.Y.Educ. Law § 665(3)(a) & (c)(i). OSC must then audit the participating institutions to ensure compliance. *See* N.Y.Educ. Law § 665(3)(b). If HESC finds that an institution erroneously certified a student, HESC's president

shall be empowered to: (i) require such payment immediately, (ii) accept a repayment schedule or installment payments over a reasonable period of time, (iii) reduce any future award received by such student by the amount of the refund due, or (iv) reduce any future payments receivable by the institution on behalf of currently eligible students by the amount of refund due with a direction to the institution to consider each eligible student's account to have been credited with the amount of his award eligibility for that term of attendance.

There are two important aspects to the statutory framework that bear on whether the plaintiff has a property right to receiving payment under the TAP program. The first aspect is that HESC is not *required* to seek a refund at all, much less by any of the four methods set forth above. The president of HESC is empowered to, and in all likelihood will, seek repayment of disallowances. However, it is not required. Thus, under the express language of § 665, the president of HESC has discretion to seek a refund or not. *See, generally Walz*, 46 F.3d at 168 (holding that the level of discretion committed to governmental entity is a factor bearing on whether the party has a property interest). The fact that HESC is not required to withhold TAP funds after OSC determines that funds were wrongfully certified by an institution tends to show that Interboro does not have a property interest in the actual receipt of funds. This is in accordance with this Court's decision in *Midtown*. In *Midtown*, this Court held that an institution had a property interest in continued participation in the TAP program. 1990 WL 21287 *6. However, the Court suggested that if the TAP funds were granted but paid to another entity, such as the student, there may be no impingement of a property interest. *Id.*

The second aspect is the requirement that OSC conduct a post-payment audit. The fact that the school certifies that it is entitled to funding, and that OSC is required to do a subsequent audit to determine the propriety of that certification as to each student demonstrates that, at best, the institution has an expectancy with respect to the receipt of

TAP funds prior to audit, not a right. In the Court's view, the plaintiff has no property interest in the funds received until after an audit demonstrates that the funds were properly certified. *See Yorktown Medical Laboratory, Inc. v. Perales*, 948 F.2d 84, 89 (2d Cir.1991). In *Yorktown*, the Court did not address whether a plaintiff had a property interest in participation in the Medicaid program, as the issue had already been answered in the affirmative. Rather, it addressed whether the plaintiff had a property interest in receipt of payments for services rendered. *See Id.* The Court concluded that the plaintiff did not have a "property interest grounded in either the Medicaid Act or New York regulations to payment for claims pending investigation to determine illegality." *Id.* (citations omitted). In essence, the *Yorktown* Court concluded that the plaintiff has no property interest in the receipt of funds prior to a final determination that the plaintiff is, in fact, entitled to the funds claimed. *Id.*

Although the factual and procedural context of *Yorktown* are not on all fours with the instant case, in that the funds in *Yorktown* were withheld pending completion of an investigation and in the instant case claims that have yet to be audited are being withheld as a set off against disallowed funds, the issue as to whether the plaintiff has a property interest in funds prior to a final determination of the propriety of the claims/certifications is sufficiently similar. Moreover, the statutory framework is similar. Just as with the Education law's requirement that TAP certifications be audited, the Medicaid Act requires an audit of claims submitted by Medicaid providers. *See* N.Y.Educ. Law § 665(3)(b); *Yorktown, supra* at 89. In addition, if errors are discovered, each program permits an overseeing agency to seek restitution. *See* N.Y.Educ. Law § 665(4)(c); *Yorktown, supra* at 87. Accordingly, the Court adopts the reasoning of Yorktown, and finds that the plaintiff has not alleged a valid property interest.

For the reasons stated above, the plaintiff's due process claim must be dismissed.

## 2. Arbitrary and Capricious

The Court need not discuss this prong of the substantive due process claim, given the Court's finding that the plaintiff has failed to allege a valid property interest.

## E. 42 U.S.C. § 1983 Claim

The plaintiff has premised its 42 U.S.C. § 1983 claim the alleged actions of the defendants in violating the Substantive Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment. Given that this Court has dismissed the plaintiff's Due Process claim, the sole remaining basis for the 42 U.S.C. § 1983 claim are the allegations of a violation of the Equal Protection Clause.

 To state a valid civil rights claim under 42 U.S.C. § 1983, a Plaintiff must allege facts showing that a person acting under color of state law deprived the Plaintiff of a right, privilege, or immunity secured by the United States Constitution or the laws of the United States.[4] *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Kern v. City of Rochester,* 93 F.3d 38, 43 (2d Cir.1996); *Costello v. Fairfield,* 811 F.2d 782 (2d Cir.1987). The Court notes that it may not apply a "heightened pleading standard" to civil rights claims under 42 U.S.C. § 1983. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

It is not contested that the defendants are state actors.

 "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), *citing, Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). The Circuit also has held that the personal involvement of a supervisory defendant may be shown by evidence that: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of the [plaintiff] by failing to act on information indicating that unconstitutional acts were occurring." 58 F.3d at 873 (citation omitted). With these legal guidelines in mind, the Court now turns to the allegations relating to the Equal Protection claim, and if necessary, a consideration of whether each defendant is properly included under the scope of the claim.

## 1. Equal Protection Claim

 The equal protection clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985), *citing Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). A violation of equal protection by selective enforcement arises if:

(1) the person, compared with others similarly situated, was selectively treated; and

(2) . . . such selective treatment was based on impermissible considerations such as . . . intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Crowley v. Courville,* 76 F.3d 47, 52–53 (2d Cir.1996) (stated in context of summary judgment motion), *quoting LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994) (further citation omitted).

 In the context of the present motion, and taking the allegations of the Complaint

---

4. 42 U.S.C. § 1983 states:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the depravation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

to be true, the Court finds that the plaintiff has alleged a viable Equal Protection claim. First, the plaintiff has alleged that of all institutions receiving TAP funds, it is the only school audited three times in the past six years, and of those institutions audited more than once during that time frame, all were downstate schools. Complaint ¶ 116. In essence, the plaintiff has pleaded that the downstate schools are treated more harshly than upstate schools. In addition, the plaintiff alleges that, in relation to the audits at Interboro, OSC and SED have ignored policies and regulations applied to all other schools. Complaint ¶ 117. For example, the plaintiff alleges that OSC and SED applied a different definition of "matriculated status" than that set forth in § 145–2.4(3) of the Commissioner's Regulations and have refused to permit retroactive matriculation where such action is necessary to correct clerical error or administrative delay, that OSC and SED have disavowed a long-standing policy of considering eligible for TAP funds those students who have successfully completed institutional degree requirements, that OSC has refused to acknowledge the plaintiff's admissions practices, and that OSC has wrongfully relied on and incorrectly interpreted § 52.2(d) of the Commissioner's Regulations. Complaint ¶ 117. Finally, the plaintiff alleges that the aforementioned disparate treatment was motivated by an animus and ill-will of SED, and in particular, the defendant Nolan toward Interboro, and the defendants Nolan and Attmore's bad faith attempt to put Interboro out of business. Complaint ¶ 119.

The Court finds that the Complaint alleges a viable Equal Protection claim. The defendants' arguments for dismissal are twofold: First, the defendants argue that the plaintiff's allegations are conclusory, and thus, insufficient to make out a viable claim. However, the Court finds that the Complaint alleges sufficient facts to make out a claim for a violation of the Equal Protection Clause. Second, the defendants argue the merits of the allegations. In effect, the defendants try to compel the Court to treat this motion as one for summary judgment. The Court declines to do so.

Having stated a viable claim, the Court must now consider whether each of the named defendants may be held liable under 42 U.S.C. § 1983.

### 2. Supervisor Liability

As to the defendants Mills and Grinage, the plaintiff has voluntarily withdrawn the Complaint as against them, and has consented to dismissal.

■■■ As to the defendant McCall, the Complaint states that after being informed of the wrongful conduct of the defendants Attmore, his subordinates, and the defendant Nolan, McCall failed to remedy the wrong. *See* Complaint ¶¶ 63–65, 72, 96, 108. These allegations are sufficient to withstand a motion to dismiss the § 1983 claim as against the defendant McCall. *See Colon,* 58 F.3d at 873.

■■■ As to the defendant Maurer, the Complaint alleges that he adopted the allegedly defective and ill-motivated OSC audit despite knowledge of Interboro's objections, that he denied a request for a hearing, and that he sought recoupment of disallowances in furtherance of the bad faith motive to shut Interboro down. *See* Complaint ¶¶ 99–103, 109–111. The Court finds that the allegations contained in the Complaint are sufficient to withstand a motion to dismiss the § 1983 claim as against the defendant Maurer. *See Colon,* 58 F.3d at 873.

The defendants Attmore and Nolan do not contest their personal involvement in the actions underlying the plaintiff's § 1983 claim.

For the reasons stated above, the Court denies the defendants' motion to dismiss the plaintiff's 42 U.S.C. § 1983 claim predicated on allegations of an Equal Protection Clause violation, as against the defendants McCall, Maurer, Attmore, and Nolan. The defendants' motion is granted as against the defendants Mills and Grinage.

### F. Qualified Immunity

■■■■ "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Yet, even if the rights in question are clearly established, a government actor may still be shielded by qualified immunity if "it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir.1990). Accordingly, the subjective beliefs of the defendants are irrelevant to the Court's determination. *Finnegan v. Fountain*, 915 F.2d 817, 822 (2d Cir.1990). For an action of a government employee not to be covered by qualified immunity "in light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

 "The qualified immunity standard … provides ample support to all but the plainly incompetent or those who knowingly violate the law." *Burns v. Reed*, 500 U.S. 478, 480, 111 S.Ct. 1934, 1936, 114 L.Ed.2d 547 (1991). The general rule is that "[q]uestions of immunity should be resolved at the earliest possible stage of the litigation so that an officer who is immune from suit will not have to proceed through a lengthy trial to establish that fact." *Dempsey v. Town of Brighton*, 749 F.Supp. 1215, 1227 (W.D.N.Y. 1990). However, qualified immunity jurisprudence instructs that the standard for determining qualified immunity in federal court, "was designed to facilitate resolution of the defense on a motion for summary judgment." *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir.1990). In *Warren*, the Second Circuit stated that the "better rule" is for the Court to decide the issue of qualified immunity as a matter of law, "preferably on a pretrial motion for summary judgment." 906 F.2d at 76; *see also, Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (the qualified immunity test "permits the resolution of many insubstantial claims on summary judgment"). The Court also notes that quite recently the Second Circuit denied a defendant's Rule 12 motion for judgment on the pleadings on the basis of qualified immunity. *See Shechter v.*

*Comptroller of City of New York*, 79 F.3d 265, 270 (2d Cir.1996).

 The present motion is made pursuant to Fed.R.Civ.P. 12(b)(6). Moreover, the present motion has been made prior to any discovery in the case. The Court is cognizant of the fact that a grant of qualified immunity at this stage would obviate certain expenses associated with discovery. However, the Court finds that the more appropriate time for determining the issue of qualified immunity, in this case, is on a motion for summary judgment. Accordingly, the defendants' motion is denied.

### III. CONCLUSION

For the reasons stated herein, the Court hereby DENIES the plaintiff's motion for a preliminary injunction, and further GRANTS in part and DENIES in part the defendants' motion to dismiss the plaintiff's Complaint, to the extent stated herein.

**IT IS SO ORDERED.**