ROSEWOOD APARTMENTS
CORPORATION,
Plaintiff,

v.

Peter Robert PERPIGNANO, Leonard Eisenberg, Irving Eisenberg, Anthony Alizio, and Joseph Alizio, Defendants and Third Party Plaintiffs,

v.

Casden Properties Operating Partnerships, L.P. and Casden Properties SUB LLC, Third Party Defendants.

No. 99 CIV. 4226(NRB).

United States District Court,
S.D. New York.

March 20, 2002.

Robert J.A. Zito, Fischbein, Badillo, Wagner & Harding, New York City, for Rosewood Apartments Corp.

Steven Michael Rabinowitz, Pryor & Cashman, New York City, for Peter Robert Perpignano, Leonard Eisenberg, Irving Eisenberg, Anthony Alizio.

Richard B. Feldman, Feldman & Gany, L.L.P., New York City, for Joseph Alizio.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

This case was filed as a declaratory judgment action by plaintiff Rosewood Apartments Corp., (hereinafter "Rosewood" or "plaintiff") against Peter Robert Perpignano, Leonard Eisenberg, Irving Eisenberg, Anthony Alizio, and Joseph Alizio (collectively, "defendants"). Plaintiff, the general partner of New Haven Plaza Associates (the "partnership"), sought a declaration that its transfer of the real property asset of the partnership to a real estate investment trust was authorized and proper. In our June 11, 2001, Opinion and Order, we found that the transfer violated the Partnership Agreement (the "Agreement"). *Rosewood Apartments Corp. v. Perpignano*, 2001 WL 649824, at *6 (S.D.N.Y. June 11, 2001) ("June Op."). Now pending before this Court are five motions by the defendants, who are five of the partnership's six limited partners. First, defendants seek partial summary judgment with respect to their counterclaims for rescission of the transaction in question and for an accounting. Defendants also move to amend their counterclaim in light of our earlier ruling; move for a preliminary injunction to prevent plaintiff and third party defendants from substituting cash as the proposed consideration in the transaction; and move for sanctions against plaintiff and third party defendants for needlessly multiplying the costs involved in this litigation. For the reasons discussed below, defendants' motions for rescission, an accounting, a preliminary injunction, and sanctions are denied; defendants' motion for leave to amend their counterclaims is granted.

## BACKGROUND

As the long, bitter history of litigation surrounding this partnership is discussed at length in our earlier decision, we will only summarize it here. The defendants in this case were founding general partners of New Haven Plaza Associates. The partnership, formed on November 14, 1978, with the intent of using tax incentives to build Section 8 housing, built such a project in Far Rockaway, Queens. After its construction, the development served as a tax shelter for the partnership. Two years later, in 1980, Real Estate Associates Limited II ("REAL II"), a California corporation, replaced Norma Perpignano as the sole limited partner and purchased an 80% interest in the partnership's profits and losses. REAL II and the defendants signed the Partnership Agreement at issue in this case.

In 1982, soon after the completion of the housing complex, litigation began in state court among the general partners (most of whom are defendants in this case), stemming from allegations of mismanagement. Justice Brucia of the Supreme Court, Nassau County, invoked the Agreement's mandatory retirement provision and converted all of the general partners to limited partner status. REAL II was given the right to appoint its affiliate, Rosewood, as the operating general partner. As of December 1998, the general partners of NHPA were Rosewood, which owned 2.25% of the partnership, and New Haven Apartments Corp., which owned .1275%. The limited partners were REAL II, which owned 85%, and the defendants, who collectively owned 12.6225%.

This action has its origin in a three-stage transaction that took place on December 30, 1998, in which REAL II sold its 85% stake in the partnership to Casden Properties Sub LLC, which in turn transferred the interest to an affiliated entity,

Casden New Haven LLP. Rosewood then transferred its general partnership interest and the defendants' limited partnership interest to Casden New Haven LLP in exchange for shares in a Real Estate Investment Trust known as Casden Properties Operating Partnership ("the REIT"). The result of the transaction was that the defendants and Rosewood, who had collectively owned about 15% of the interest in the title to the property, instead owned 55,556 operating partnership units ("OPUs") in the REIT, which were the sole remaining asset of the partnership.

In our earlier opinion, we declared this transaction to be illegal on the grounds that the transformation of the partnership from one that held real property to one that held OPUs violated the Agreement because it was contrary to the purpose of the partnership, as set out in section 2.4. June Op., at *4. Subsequent to the issuance of that decision, at a conference held June 28, 2001, we permitted defendants to move for partial summary judgment on their rescission and accounting claims and to move to amend their counterclaims to include a claim for breach of fiduciary duty, an issue which our earlier opinion noted but did not reach. On September 4, 2001, plaintiff sent defendants a letter informing them that two days later, on September 6, it would substitute $268,000 cash for defendants' share of the OPUs.

In response to that letter, we held a conference on September 6, 2001. At that conference, plaintiff's counsel stated two reasons for the substitution: first, that it was done to perfect their rights on appeal and second, because plaintiff believed that the substitution was permitted under our earlier ruling. At the conference, we chastised the plaintiff for the precipitous and deceptive manner in which it attempted to significantly change the posture of the case by taking an action that would have imme-diately caused the defendants to realize a taxable gain by recapturing the accelerated depreciation on the property. We also expressed the view that plaintiff's proposed course of action was an attempt to circumvent our June ruling. Transcript of September 6, 2001, Conference, at 5–7 ("Sept. 6 Tr."). We granted defendants' oral request to stay any such transfer until arguments could be heard as to its validity. *Id.* at 13. At that time, we also granted defendants leave to file two additional motions: one for a preliminary injunction to prevent the cash transaction, and another for sanctions. We heard oral arguments on all five motions on February 11, 2002.

## DISCUSSION

### I. Defendants' Motion for Rescission

Defendants argue that rescission is the appropriate remedy for plaintiff's breach of the Agreement. There are five grounds for rescission under New York State law: 1) failure of consideration; 2) fraud in making the contract; 3) inability to perform the contract; 4) repudiation of the contract or an essential part of it; and 5) a breach that substantially defeats the purpose of the contract. *Callanan v. Keeseville, Ausable Chasm & Lake Champlain Railroad Co.*, 199 N.Y. 268, 284, 92 N.E. 747 (1910). In order to obtain rescission, an equitable remedy, the party seeking it must show that it has no adequate remedy at law. *Lichtyger v. Franchard,* 18 N.Y.2d 528, 537, 277 N.Y.S.2d 377, 384, 223 N.E.2d 869 (1966).

While our June decision found that the OPU exchange substantially defeated the purpose of the partnership, we did not reach the question of whether defendants had an adequate remedy at law or whether equitable relief was necessary. We remain convinced that the holding of OPUs is inconsistent with the purpose of the partnership expressed in section 2.4 of the

Agreement. Nonetheless, the question remains whether defendants are entitled to an equitable remedy.

## A. The Agreement Does Not Prevent a Sale of the Property

In evaluating the substitute transaction, we view the plaintiff's attempt to replace the OPUs with cash as transforming the transaction from a transfer of the ownership to the REIT into a sale.[1] Defendants argue that the proposed substitution of cash does not remedy the breach of the Agreement on the grounds that the purpose of the Agreement was to hold the property to term and that any change violates the purpose of the partnership. There is support in our earlier opinion for such a stringent reading of the Agreement, but, upon further reflection, we believe that the proposed cash substitution has triggered additional questions that we now need to address. Specifically, we must determine whether the Partnership Agreement permits the general partner to sell the property, or whether a sale of the property constitutes so substantial a breach of the Agreement as to warrant equitable relief under *Callanan*. *See Callanan*, 199 N.Y. at 284, 92 N.E. 747 (stating that "in case of repudiation, or of a breach going to the root of the contract, unless the damages can be ascertained with reasonable certainty, rescission is a matter of right...").

### 1. Textual Analysis of the Agreement

We conclude that the general partner has the right to sell the property. Section 5.1.6 grants the operating general partner the power "[t]o sell, lease, or otherwise dispose of the Project" except as limited by section 7.1 et seq., which states that "the General Partner may not, without the prior written consent of the Limited Partner, sell or lease (except to individual tenants in the ordinary course of business) or otherwise transfer, pledge, encumber or dispose of the Project or the Property, or all or substantially all of the Partnership's other assets."

In opposing plaintiff's right to sell, the defendants rely heavily on two provisions. First, they argue that the Agreement makes a clear distinction between the terms "Project" and "Property." The Agreement defines "Project" as "the housing apartment project consisting of 344 units...and attendant facilities under construction". Agreement, § 1.26. It defines "Property" as "the parcel or parcels of real property together with any existing improvements thereon...situated in Queens County, New York." Agreement, § 1.27. Defendants rely on the fact that section 5.1.6 grants the general partner the right to sell only the Project, but not the Property, subject to the limitations of section 7.1.

Defendants' reading requires a level of consistency in the use of terms that the Agreement does not justify because the Property/Project distinction is not maintained throughout the agreement. For example, section 10.2 is entitled "Sale of Project–Distributions Upon Dissolution and Termination." If the Project/Property distinction advocated by defendants applied here, then, even if an event causing dissolution were to occur, the Agreement would only permit the sale of the Project, not the Property. Certainly, the use of the term "Project" in section 10.2 must permit the sale of the Property as well. Therefore, we cannot assume that the use

---

1. As we stated at oral argument, we are aware that this interpretation differs from the view we expressed at the September 6 conference. After considering the ramifications of not allowing Rosewood to cure, we have reconsidered the statement that Rosewood could under no circumstances sell its assets.

of the term Project alone in section 5.1.6 is expressly intended to exclude the Property. Furthermore, the definition of "Disposition of Partnership Property" in section 1.7 expressly refers to a disposition of "all or substantially all of the Partnership's property" "pursuant to a plan of disposition formulated by the Operating General Partner," which strongly suggests that the Agreement contemplates the possibility of a sale initiated by the general partner. Agreement § 1.7. The provision is not limited to a disposition upon dissolution.

■ As we discussed in our June opinion, the defendants' reliance on the consent provisions of section 7.1 is also misplaced. While the Agreement requires that the general partner obtain the consent of the limited partners before conducting a sale, it must be remembered that the defendants lost their voting rights as limited partners when the state court invoked the Agreement's mandatory retirement provision. *See* June Op., at \*3. The relevant part of the retirement provision states that persons who are forced to resign "shall be limited partners, but with no vote or control . . . ." Agreement, § 8.3.4. Given the limited partners' closely circumscribed rights under the Agreement, we determined in our earlier opinion that section 8.3.4 was specifically intended to strip the retired partners of their right to veto any proposed sale under section 7.1.1. June Op., at \*3. If the defendant limited partners have no vote, then the consent of limited partners required in the Agreement consists of a majority of the remaining limited partners. *See* Agreement, § 13.14 (stating that consent of the limited partner means the consent of a "majority in interest."). REAL II, the only voting limited partner, assented to the transaction.

## 2. The Agreement Must Be Interpreted in a Reasonable Manner

■ The consequences of the defendants' reading of the Agreement further undermine their interpretation. According to the defendants, because power to sell the property is not explicitly granted to the general partner under section 5.1.6 and is not mentioned among the purposes listed in section 2.4, the partnership must continue until the end of its term. At oral argument, defendants argued that the partnership was always intended to last until it expires in 2028 because, at that point, the mortgage will have been paid off and there will be no tax recapture of depreciation, only a capital gain realization. Transcript of February 11, 2002, Oral Argument, at 9–10 ("Feb. 11 Tr."). We find this interpretation of the Agreement to be inconsistent with the Agreement itself. While the Agreement provides for termination of the partnership in 2028, it also anticipates that the partnership could terminate sooner than that if the parties so choose. *See* Agreement, § 1.7 (calling for the general partner to develop a plan of disposition without specifically limiting it to the context of a dissolution); Agreement, § 7.1.2 (permitting a sale of the property with the consent of the general and limited partners). It also contains provisions calling for termination if certain conditions occur, such as death of a partner. *See* Agreement, § 10.1.1 (setting out conditions that trigger a dissolution; *see also* Agreement § 10.1.2 (permitting dissolution in the absence of any of the events listed in section 10.1.1 if all partners agree).

Defendants' reading of the Agreement would permit the objection of a *non-voting* party to prevent a disposition, even if prudent business judgment demanded a sale and would lock the partners into holding the property for fifty years. As such a

reading defies business logic, a more plausible one must be discerned. *See Bensen v. American Ultramar Ltd.*, No. 92 CV 4420, 1997 WL 317343, at *4 (S.D.N.Y. June 12, 1997) ("When the literal interpretation of a contract would lead to an absurd result, it should be rejected in favor of an interpretation that would meet the reasonable expectations of the parties"). A more rational reading of the Agreement would permit a sale or a dissolution with the consent of all voting partners. Indeed, this is what the Agreement provides. As noted earlier, defendants no longer have the voting rights to block any such sale, and all voting parties agree to a sale. Thus section 7.1.2 does not provide a barrier to the plaintiff's right to sell the property.

## B. The Presence of Real Property Does Not Mandate Equitable Relief

At oral argument, defendant also contended that, even if the agreement does appear to permit a sale of the property, the fact that this transaction deals with real property nonetheless permits equitable relief to be granted because the unique attributes of real property make its value difficult to ascertain. Feb. 11 Tr., at 39–40. While real property interests often permit equitable remedies, "[t]he right to specific performance is not automatic," and should only be granted when the remedy at law is inadequate. *Pecorella v. Greater Buffalo Press, Inc.*, 107 A.D.2d 1064, 1065, 486 N.Y.S.2d 562, 563 (4th Dep't 1985). Therefore, in order to obtain an equitable remedy, the defendants must show that they have no adequate remedy at law.

## C. Fiduciary Duty Analysis

 Nonetheless, the fact that the general partner has the right under the Agreement to sell the property does not end the inquiry. As a general partner, Rosewood had a fiduciary duty to act in the interests of the limited partners. This fiduciary duty extends to any sale and, as we noted in our earlier opinion, to transactions with affiliated parties. While the Agreement permits related party transactions, they must be on "terms reasonably competitive with those which may be obtained in the open market." Agreement, §§ 5.2.3, 5.2.5. Accordingly, Rosewood had the right to sell the partnership's assets, even to an affiliated party, but it had to obtain a price comparable to what it would have received on the open market. Furthermore, the fiduciary duty to the limited partners also encompasses an obligation to ensure that the timing of the decision to sell be grounded in reasonable business judgment and not cause unnecessary tax expense to the limited partners.

By substituting $268,000 for the OPUs, Rosewood has effectively purchased defendants' limited partnership interest for $268,000. Thus, we must determine whether that sale price provides adequate compensation for defendants' rights under the contract. If the compensation is inadequate, then plaintiff breached the Agreement by violating its fiduciary duty to the limited partner defendants.[2]

The damages for breach of fiduciary duty in this transaction can be determined if a "reasonably competitive" value for the property on the date of the transaction can be determined.[3] However, the plaintiff

---

2. For the purpose of determining whether Rosewood breached its fiduciary duties, we look only to what the defendants will receive as compensation and whether the timing of the sale itself breached any fiduciary duties to defendants. Whether plaintiff incurred any taxable income in the transaction is immaterial to this inquiry.

3. We note that, while property may be difficult to value precisely, damages do not have to be perfectly ascertainable in order to provide a remedy at law. *See USA Network v.*

cannot simply appraise the value of the New Haven Plaza Apartments and place a value on defendants' 12.6225% share of the partnership. Even if the property valuation submitted by plaintiff is accurate, a sale would trigger the Agreement's provisions on distributions. Therefore, in order for the substituted transaction not to violate the Agreement, plaintiff would have to compensate defendants as if it had sold the property on the open market and made the distributions due to the limited partners as provided for under the Agreement. The amount owed to the limited partners would be calculated by starting with the price that would have been generated by a sale for fair market value on December 31, 1998. The Disposition Profits—what the defendants would have received from an actual sale—are calculated under section 4.1.2 of the Agreement. According to section 4.1.2.4, any profits remaining after making all allocations are to be divided evenly between the general partner and the limited partner. Therefore, defendants should receive a share of the Disposition Profits allocated to the limited partner in proportion to their ownership of the limited partnership shares.

In order to achieve a proper allocation under section 4.1.2, all allocations of operating profits made under section 4.1.1 must be complete prior to calculating the Distribution Profits. This requires that all prior distributions have been made properly, which necessitates a full review of the partnership's accounts. Defendants' damages can be ascertained by determining whether the value of their partnership interests at the time of sale, as determined by the value of the defendants' share of

the property plus any amount due the defendants in profit distributions, exceeds the $268,000 in cash that plaintiff has offered to substitute.

In sum, the Agreement does accord the general partner the right to sell the property consistent with the general partner's fiduciary obligations. Further, in the absence of a showing that money damages will not adequately compensate the defendants, defendants' motion for the equitable remedy of rescission of the December 31, 1998, transactions is denied.

## II. Defendants' Motion for an Accounting

■ Defendants have moved for a summary accounting procedure for distributions they claim based on the disbursements made by the general partner during the course of the partnership, which defendants allege were not made in accordance with the Agreement. A partnership accounting, however, is a formal process requiring a complete review of the partnership's records and cannot be done on a summary basis. *See Kaminsky v. Kahn,* 23 A.D.2d 231, 241, 259 N.Y.S.2d 716, 726–27 (1st Dep't 1965) (holding that a court must fix the scope of the accounting and then conduct the actual investigation of the partnership's books). We cannot, therefore, award defendants the distributions allegedly due based on a summary procedure.

■ We turn now to plaintiff's objections to conducting any kind of accounting. First, plaintiff argues that there is no subject matter jurisdiction because there is not complete diversity between defendants

*Jones Intercable, Inc.,* 704 F.Supp. 488, 492–93 (S.D.N.Y.1989) (holding that equitable relief is only appropriate where money damages would be very difficult to ascertain). *See also Payrolls & Tabulating, Inc. v. Sperry Rand Corp.,* 22 A.D.2d 595, 598 257 N.Y.S.2d 884,

887 (1st Dep't 1965) (stating that "where the aid of equity is sought a mere allegation of inadequacy of legal remedy or difficulty in ascertainment of the measure of damage will not warrant its intervention, nor change an action at law into one in equity").

and certain third party defendants. One of the defendants is a New York citizen, and several of the limited partners of Casden Properties Operating Partnership are also citizens of New York. *See C.T. Carden v. Arkoma Associates,* 494 U.S. 185, 197, 110 S.Ct. 1015, 108 L.Ed.2d 157 (holding that partnership is citizen of every state in which a partner is a citizen); *Cerberus Partners, L.P. v. Gadsby & Hannah,* 976 F.Supp. 119, 121–23 (D.R.I.1997) (extending the rule in *Carden* to all layers of a partnership). The absence of complete diversity is not a bar to proceeding here. Having found that the accounting is essential to determination of the adequacy of the plaintiff's proposed cash distribution to the defendants, we find that there exists a common nucleus of operative fact between defendants' counterclaim for an accounting and the resolution of the issues arising out of the December 1998 transactions. Therefore, we will exercise our discretion to find supplemental jurisdiction over defendants' counterclaim for an accounting, as this is the only way to accurately ascertain the damages for breach of fiduciary duty. 28 U.S.C. § 1367.

█ We also reject plaintiff's contention that an accounting cannot be carried out without dissolving the partnership. *See Lord v. Hull,* 178 N.Y. 9, 19, 70 N.E. 69 (1904) (holding that, in limited circumstances, courts can intervene and order an accounting before the partnership has dissolved). *See also St. James Plaza v. Notey,* 95 A.D.2d 804, 805, 463 N.Y.S.2d 523, 526 (2d Dep't 1983) (stating that an accounting may be appropriate in the absence of a dissolution where there is no risk of piecemeal judgments to resolve the issues between the parties). In this case, we see little risk of piecemeal litigation. The parties have been through 20 years of litigation, and plaintiff's proposed substitution would effectively, aside from the filing

of formal dissolution papers in state court, mark the end of the partnership. Thus, rather than creating the risk of further litigation, our approach will hopefully bring an end to the litigation between these parties.

█ Finally, we reject plaintiff's argument that defendants failure to join REAL II and NHPA prevents the Court from proceeding. Under Rule 19, a party is only deemed necessary if: 1) the person's absence will preclude complete relief among the parties; 2) the absent party will be prejudiced by the continuation of the action; or 3) the absence of a party presents a substantial risk of multiple litigation. Fed.R.Civ.P. 19(a). Applying these standards, we find that neither REAL II nor NHPA is a necessary party to this action. As the accounting we are directing will take place as part of the determination of defendants' breach of fiduciary duty claim, none of the other partners will be required to return any of the distributions they have received. Moreover, neither REAL II nor NHPA will be prejudiced by a judgment that Rosewood breached its fiduciary duties to defendants. Finally, we note that REAL II, Rosewood, and the Casden entities are all related parties who presumably share the same interests, which can, if the need arises, be protected by counsel for Rosewood and the third party defendants.

As discussed above, an accounting is necessary to determine whether plaintiff breached its fiduciary duty to defendants. At the conclusion of the accounting, a determination of the disbursements due to defendants can be made, which will determine what, if any, allocations need to be made to them in order to calculate their disposition distributions. Accordingly, defendants' motion for partial summary judgment on their accounting claim is denied, but an accounting for purposes of adjudi-

cating their fiduciary duty claim is ordered.

### III. Defendants' Motion to Amend Counterclaim

Defendants have also moved to amend their counterclaim. In *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court held that district courts should freely grant leave to amend in the absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies in the pleading, undue prejudice, or futility. The proposed Second Amended Counterclaim adds a claim for breach of fiduciary duty, which we discussed as a potential issue in our earlier opinion. June Op., at *5. As this opinion has set out, the defendants' damages, if any, arise out of the alleged breach of plaintiff's fiduciary duty. The other proposed changes are stylistic, not substantive, in nature.

Plaintiff argues that the proposed amendments are futile. As the discussion above makes clear, we reject plaintiff's futility argument. More generally, we find that none of the bases outlined in *Foman* justify a denial of defendants' motion to amend.

### IV. Defendants' Motion for a Preliminary Injunction

 In response to plaintiff's letter of September 4, 2001, and the conference held on September 6, 2001, defendants moved for a preliminary junction to prevent plaintiff from substituting cash for the OPUs. At the September 6 conference, we granted defendants' oral request to stay the transfer pending the outcome of this motion. Sept. 6 Tr., at 13.

In order to obtain a preliminary injunction, the moving party must prove: a) irreparable harm and b) either a likelihood of success on the merits or serious questions on the merits and that a balance of the hardships favors granting of the injunction. *Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 967 (2d Cir. 1995). The threshold showing, therefore, is irreparable harm, which requires a demonstration that money damages would be insufficient to make the moving party whole. *SG Cowen Securities Corp. v. Messih*, 224 F.3d 79, 84 (2d Cir.2000).

In support of their request for preliminary relief, defendants argue that, without such relief, they would suffer a recapture of their accelerated depreciation and that Rosewood lacks the assets or income to pay damages. The incurrence of tax liability caused by any breach of plaintiff's fiduciary duty could be compensated with money damages. Moreover, merely alleging an opponent's inability to pay damages does not constitute irreparable harm. *See General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F.Supp. 1070, 1075 (S.D.N.Y.1994) (holding that ordinarily a party's inability to pay money damages did not support a finding that plaintiff had no adequate remedy at law). In some limited circumstances, parties have demonstrated such a strong likelihood that their opponent will be unable to pay that courts have awarded them equitable relief. *See Philipp Bros. Div. of Engelhard Minerals & Chemicals Corp. v. El Salto, S.A.*, 487 F.Supp. 91, 95 (S.D.N.Y. 1980) (holding that plaintiff's showing that defendant's location in a distant country suffering from political instability, heavy losses in recent years, lack of liquid assets, and the fact that defendants operations had been shut down because of political unrest and labor disputes were sufficient to warrant injunctive relief rather than requiring plaintiffs to rely on money damages). However, defendants here have made no showing that plaintiff would not be able to satisfy a judgment beyond alle-

gations that NHPA is "thinly capitalized." Aff. of Richard Feldman, Def. Motion for Preliminary Injunction, ¶ 14. We conclude, therefore, that defendants have failed to show that they would suffer irreparable harm if the cash substitution were to take place and that any proven loss could not be remedied with money damages. *See Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir. 1979). Accordingly, defendants' motion for a preliminary injunction is denied.

To summarize, the cash substitution converts the transaction into a sale, which is permitted by the Agreement. Viewed as such, the issue remaining is whether the defendants have, consistent with plaintiff's fiduciary duties to defendants, received proper value for their 12.6225% limited partnership share. The appropriate value will be determined by the procedure we have outlined herein. If the defendants are able to show that the plaintiff breached its fiduciary duty by the timing of the transaction and that consequently they suffered damage from an unnecessary realization of taxable income, evidence of such damages may be part of the assessment for the breach of fiduciary duty.

## V. Motion for Sanctions

Defendants moved for sanctions against plaintiff on the grounds that Rosewood's attempt to substitute cash for the OPU transaction, its allegedly contradictory justifications for the proposed substitution, and its failure to consent to an injunction pending the Court's decision on the current motions unnecessarily added time and expense to the proceedings in this case. Defendants argue that the Court should use either Rule 11 or its inherent powers to discipline plaintiff.

We were initially skeptical about plaintiff's proffered justifications for the substitution and suggested that the plaintiff intentionally misread our prior opinion. However, upon further deliberation, we have concluded that plaintiff's actions were not precluded by that opinion and cannot be described as advanced in bad faith. Furthermore, given our initial skepticism toward the proposed substitution and our expressed irritation with the lack of notice with which plaintiff attempted to carry it out, we cannot say that defendants' motion for sanctions was itself frivolous or that its making warrants the imposition of sanctions against defendants. *See Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985) (stating that "sanctions shall be imposed" when a pleading is made for an improper purpose or when an attorney could not form a reasonable belief that the pleading is well grounded in fact or law or is a good faith argument for extending, modifying, or reversing the existing law). As we have found that both parties had a reasonable basis for their views of our earlier decision, sanctions are unwarranted, and defendants' motion for sanctions is denied. In its papers, Rosewood indicated its intent to move for sanctions against defendants for bringing a frivolous sanctions motion. Based on our comments, we believe it clear that any such motion is not likely to be successful.

## *CONCLUSION*

For the reasons discussed above, defendants' motions for rescission, an accounting, a preliminary injunction, and sanctions are denied, and their motion to amend the counterclaim is granted. As we have determined that defendants' damages, if any, arise out of the breach of fiduciary duty claim, we will evaluate that claim by determining whether the defendants received fair compensation for what was, in effect, a sale of the partnership's primary assets and whether the timing of Rosewood's de-

cision to dispose of the property violated its fiduciary duty to the limited partners.

To resolve the remaining issues, the following procedure is established. In order to determine the defendants' disposition distributions, it is necessary to learn whether the defendants received the distributions due to them under the Partnership Agreement for the period before December 30, 1998, by conducting an accounting. The parties have 30 days to agree on an independent auditor who will review all distributions prior to December 30, 1998, and determine what, if any, distributions Rosewood owed defendants and how much cash remained in the partnership as of the date of the transaction. The Court will also schedule a hearing to determine the proper valuation of the property, as if it had been sold on the open market on December 30, 1998. We anticipate that each party will hire an expert to provide a valuation of the property. The expert reports will be exchanged and filed with the Court before the hearing date. The expert reports will constitute the witnesses' direct testimony and the examination of the witnesses will commence with cross-examination.

To recap, defendants will prevail on their breach of fiduciary duty claim if the sum of the distributions due to them— including any distributions that should have been made prior to December 30, 1998, as well as the Disposition Profits due to them on account of a sale for fair market value—exceed $268,000.

The parties should appear for a scheduling conference on April 3, 2002, at 4 p.m.

**IT IS SO ORDERED.**